FIFTH DIVISION

  February 16, 2001

No. 1-00-0336

FERN HORWITZ, by Mark Gilbert, ) Appeal from the

Her Father and Attorney-In-Fact, Indiv. and ) Circuit Court of

on Behalf of Those Similarly Situated, ) Cook County.

)

Plaintiff-Appellant, )

) No.  95 CH 1787

)

) Honorable

BANKERS LIFE AND CASUALTY ) Sidney A Jones, III,

COMPANY, ) Judge Presiding.

)

Defendant-Appellee. )

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Fern Horwitz (Horwitz), by her father and attorney-in-fact, brought this action on behalf of herself and a purported class of policyholders who were allegedly injured by the manner in which the defendant insurance company, Bankers Life & Casualty Company (Bankers), calculated and applied its premium rates for individual health insurance policies.  Plaintiff claimed that the manner in which Bankers calculated those premiums breached its contract (counts III and IV), violated section 364 of the Illinois Insurance Code (Insurance Code) (215 ILCS 5/364 (West 1994)) (counts I and II), and violated section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 (West 1994)) (count VI).  She also claimed that Bankers breached its contract with her by increasing her premiums twice–rather than once–during a few years that her coverage was in effect (count V), and that Bankers fraudulently concealed from her some of the practices she claims were unlawful (count VII).

Initially, the trial court partially granted summary judgment as to count III in plaintiff's favor and summary judgment as to count V in defendant's favor.  Bankers then asked the court to reconsider its ruling as to count III, which was granted.  Ultimately, the trial court dismissed all of plaintiff's claims, holding that: (1) plaintiff's policy was governed by Colorado law; (2) plaintiff's breach of contract and consumer fraud claims were barred by the filed rate doctrine; (3) no private right of action exists under section 364; and (4) defendant had not breached its contract by increasing premiums more than once during certain policy years.  However, the court only decided Horwitz's individual claims and never decided whether the case should proceed as a class action.  Plaintiff now appeals the trial court's ruling on counts I through III, V, and VI of her third amended complaint.
(footnote: 1)  
For
 the reasons that follow, we affirm in part, reverse in part, and remand the cause for further proceedings.

This case arose from a dispute between Horwitz and Bankers regarding premium increases for plaintiff's individual health insurance policy.  Specifically, plaintiff alleges that, beginning in February 1991, defendant increased her premiums by amounts greater than permitted by the terms of her policy.  She also claims that, beginning in 1991, defendant increased her premiums more often than allowed by her policy.  These formed the bases of plaintiff's complaint.  

In February of 1985, Joel Horwitz, plaintiff's then-husband, purchased a family policy from Bankers under form CR-97N.  At that time, the Horwitz family was living in Denver, Colorado.  In September of that year, plaintiff became disabled by mental illness.  In September of 1986, while divorce proceedings were pending and the Horwitzes still lived in Colorado, Mr. Mark Gilbert (Gilbert), plaintiff's father, asked Mr. Horwitz to agree to the issuance of a separate policy, in plaintiff's own name, for which plaintiff would be solely responsible.  Mr. Horwitz agreed, and plaintiff's individual policy was issued to her on October 2, 1986, at which time she was residing at the Colorado Mental Health Institute in Fort Logan, Colorado. 

In approximately September of 1987, plaintiff moved to Illinois and became an Illinois resident.  Defendant, however, continued to treat her policy as a Colorado policy in accordance with its established practice concerning insureds who move from state to state.  In short, to avoid confusion regarding premium rates and coverages, in such instances, Bankers follows a "state of issuance" rule, under which it continues to apply the premium rates and coverages of the state of issuance.  Thus, defendant charged plaintiff the Colorado premium rates after plaintiff moved to Illinois.  Defendant also notified plaintiff of this fact after she moved and invited her to convert her policy to an Illinois policy.  Plaintiff declined and paid the Colorado premium rates throughout the life of her policy. 

In February of 1995, plaintiff filed a two-count complaint that asserted claims under section 364 of the Illinois Insurance Code and for breach of contract, based on defendant's use of its experience with claims and losses under form CR-97N to determine the premium rates applicable to that form.  In February of 1997, plaintiff filed her third amended complaint, which contained seven counts that were all based on the allegations of "the death spiral," which will be described hereinafter. 

In her complaint, plaintiff asserted that the defendant gutted the value of the policy by "closing the block"--  meaning that the policy series was no longer sold to new customers.  The impetus for such action, plaintiff argued, is that as the number and amount of loss claims (loss experience) grow larger for a policy series, an insurance company becomes trapped in having to renew an economically improvident policy.  The effect of Bankers' response to this phenomenon, however, was that Bankers began pricing its renewal premiums based on the loss experience of just that closed block group.  In other words, by "closing the block," Bankers' calculations of what the policyholder's renewable premiums should cost arose only from the statistical data of those remaining in the closed block group.  As this limited pool of insureds became older and more sickly, the argument continued, their claims increased and their renewal rates, or premiums, rose.
(footnote: 2)  As they rose, healthy insureds, who could obtain coverage elsewhere, cancelled their policies, leaving behind only those policyholders whose medical condition prevented other coverage.  Those who could not qualify for new coverage, consequently, either died or could no longer afford to keep their coverage alive by paying the dramatic premium increases.  Ultimately, plaintiff asserted, Bankers was able to force their healthcare costs to be shifted from Bankers to the insureds (resulting in, effectively, self-insurance) and accomplished nonrenewal by forcing them off the policy.  This is what is referred to by plaintiff as the "death spiral."

Counts I, II, IV, and VII were dismissed under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1994)) as follows.  On November 20, 1995, and on May 24, 1996, the circuit court dismissed with prejudice plaintiff's claims alleging a violation of section 364 of the Illinois Insurance Code, on the ground that no private right of action exists under section 364.  These claims were counts I and II of plaintiff's original complaint and were subsequently repleaded in all of the amended complaints.  On June 13, 1997, the circuit court dismissed without prejudice plaintiff's claims alleging (a) breach of contract based on allegedly selective premium increases, and (b) fraudulent concealment, which were counts IV and VII of plaintiff's third amended complaint.  Plaintiff never repleaded these claims.

However, counts III and V were made the subjects of cross-motions for partial summary judgment.  While the circuit court partially granted summary judgment to defendant on count V, it also partially granted summary judgment to plaintiff on count III.  Specifically, in count III, plaintiff focused on what she believed to be the four circumstances in which a premium may be changed: changes in age, benefits, the Consumer Price Index, or new rate tables.  She quoted Bankers' policy: 

"RENEWAL PREMIUM

We may change the premium rates for this policy.  The change may be due to a change in benefits.  Since some benefit amounts are tied to the Consumer Price Index (CPI) for medical/hospital doctor fees, it's expected that premium and benefit changes will occur each year.  The change may also be due to a new table of rates or an increase in age of a family member.  We can only change the premium if we change it for all policies like yours in your state on a class basis.  We'll tell you in advance of any changes in the premium.  The premium for this policy is expected to increase each year." 

The focus was on whether the clause, "[t]he change may also be due to a new table of rates," permitted Bankers to shift the rate tables for this (or any) policy from broad-based community experience to the experience of just the finite, closed-off subgroup.  The court held:

 "And this phrase reasonable expectations of the parties certainly cannot mean that it is reasonable that with each renewal of the contract that ones insureability [
sic
] is going to be recalculated 
ab initio
.

* * * 

With time under the scheme that is advanced by the defendant, the group members' premiums necessarily increase to levels that are destined to approach the actual medical payments themselves.  As these premiums increase along with illnesses, the degree of fortuitous[ness] decreases.

Of course, insurance is intended to protect one from a fortuitous event.  And since the degree of fortuitousness decreases, with it the characteristics of an insurance policy decreases [
sic
] as well.  I think that is why the plaintiff is entitled to summary judgment and that is why the defendant is not entitled to summary judgment ." 

After that ruling, defendant raised the filed rate doctrine as an affirmative defense for the first time in a supplemental brief after its initial reconsideration brief (after it lost summary judgment) was filed.  Basically, this doctrine states that where a regulated entity is required to file its rates with a governmental agency charged with authority to regulate those rates, an individual is barred from attacking those rates in a civil action for damages.  On reconsideration, the court found that this newly asserted filed rate doctrine precluded any action under the contract –given Bankers' filing of its rates with the Colorado Division of Insurance (CDOI) without its objection– and granted summary judgment to defendant on count III.  Subsequently, it also barred Horwitz's Illinois Consumer Fraud Act claim (count VI) for the same reason.  Plaintiff now appeals the dismissal of counts I, II, III, V, and VI.

This appeal deals mainly with issues of law that are subject to 
de novo
 review.  
E.g.
, 
Jackson v. South Holland Dodge, Inc.
, 312 Ill. App. 3d 158, 162 (2000) (A section 2-615 motion to dismiss is reviewed 
de novo 
on appeal); 
Peddinghaus v. Peddinghaus
, 314 Ill. App. 3d 900, 904 (2000) ("The standard of review in cases involving summary judgment is 
de novo
").  However, the parties disagree as to the applicable standard of review regarding the court's decision to admit the affirmative defense of the filed rate doctrine, through its granting of defendant's motion to reconsider, in light of plaintiff's contention that defendant waived the filed rate doctrine as an affirmative defense.  Plaintiff argues that according to 
Zook v. Norfolk & Western Ry. Co.
, 268 Ill. App. 3d 157 (1994), the review of a trial court's decision to strike (or admit) an affirmative defense is reviewed 
de novo.
  Defendant, however, cites, "[t]he determination of whether to grant a motion for reconsideration is within the circuit court's discretion, subject to reversal only upon abuse of such discretion."  
United States Fidelity & Guaranty Co. v. Alliance Syndicate, Inc.
, 286 Ill. App. 3d 417, 419 (1997).  

We note that the intended purpose of a motion to reconsider is to bring to the court's attention (1) newly discovered evidence which was not available at the time of the first hearing, (2) changes in the law, or (3) errors in the court's previous application of existing law.  
Merchants Bank v. Roberts
, 292 Ill. App. 3d 925, 929 (1997).  In granting defendant's motion to reconsider, the trial court stated, "[t]he court is of the view that the filed rate doctrine controls the entire case.  The plaintiff's motion to reconsider was taken by the court simply as a device by which the court – to afford the court an opportunity for its ruling to be consistent with all of that." 

It is unclear whether plaintiff is challenging the trial court's grant of defendant's motion to reconsider for a failure to meet the 
Merchants Bank
 test.  
However, one argument she does explicitly make is that because defendant did not assert the filed rate doctrine as an affirmative defense in its answer or reply, it was untimely to assert it in a motion for summary judgment according to section 2-613(d) of the Code of Civil Procedure. 735 ILCS 5/2-613(d) (West 1998).  It has long been held that section 2-616(a) (735 ILCS 5/2-616(a) (West 1998)) permits a party to amend its pleadings to include an affirmative defense at any time prior to final judgment.  Further, the trial court's determination of whether to allow or deny an amendment of a pleading is discretionary and will not be reversed absent an abuse of discretion.  
In re
 Estate of Hoover
, 155 Ill. 2d 402, 416 (1993).  Consequently, whether plaintiff is challenging the trial court's acceptance of the filed rate doctrine as an affirmative defense or its grant of defendant's motion for reconsideration, we analyze the trial court's actions for this issue under an abuse of discretion standard.
(footnote: 3)
 After granting defendant's motion for reconsideration, the circuit court determined that plaintiff's policy was governed by Colorado law.  Plaintiff's first argument is that the court erred in this decision.  Because plaintiff's policy does not contain a choice of law provision, Illinois courts must apply Illinois' choice of law rules to determine the governing law.  
Diamond State Insurance Co. v. Chester-Jensen Co.
, 243 Ill. App. 3d 471, 485 (1993).  Illinois' choice of law rules apply the law of the state with the most significant contacts.  
Hofeld v. Nationwide Life Insurance Co.
, 59 Ill. 2d 522, 529 (1975).  According to 
Hofeld
, given a 
de novo
 review, this court is to apply the following factors to determine the most significant contacts:  

"[I]nsurance contract provisions may be governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the general contract."  
Hofeld
, 59 Ill. 2d at 528.

In light of this test, plaintiff lists the following factors attributable to her policy: (1) she is domiciled in Illinois; (2) Bankers is an Illinois corporation with its headquarters in Illinois; (3) Illinois is the place of performance, as premium notices have been delivered in Illinois, premium payments as well as claims are directed to Banker's office in Illinois, and Bankers disburses payments for plaintiff's claims from its Illinois office; and (4) Horwitz brought this suit in Illinois to enforce her rights under the Illinois Insurance Code.  

As we previously noted, Bankers continued to treat Horwitz's policy as a Colorado policy after she moved to Illinois.  In so doing, it notified her that it was treating her policy as such and gave her the option of having a new Illinois policy issued.  When plaintiff declined, Bankers charged her the premium rates that had been filed with the CDOI, which were actually cheaper than the rates in Illinois.  In fact, the CDOI asserted its jurisdiction and considered plaintiff's complaints.  In a letter dated March 25, 1992, the CDOI stated: "The Colorado Department of Insurance Agrees, based on evidence provided, that Ms. Horwitz's contract is a Colorado contract and, because of that, jurisdiction rests with Colorado, not Illinois."  Six months later, the CDOI wrote another letter to Mr. Gilbert, Horwitz's father and attorney:

"[T]he initial policy issued to your daughter, Fern Horwitz is a Colorado contract and falls within our jurisdiction to discipline Bankers Life Insurance Company, should any violation of Colorado statute be uncovered.  The review which we are presently conducting is a final one to determine if compelling evidence exists for the Colorado Division of Insurance to take action against Bankers Life Insurance Company."  

This court recently noted that "[i]n conducting a significant-contacts analysis, Illinois courts do not merely count the contacts.  See 
Malatesta v. Mitsubishi Aircraft International, Inc.
, 275 Ill. App. 3d 370, 379, 655 N.E. 2d 1093, 1099 (1995).  Instead, they apply a more sophisticated ‛interest analysis' that involves a three-step process: (1) isolate the issue presented; (2) identify the relevant policies embraced in the laws in conflict; and (3) examine the contacts and determine which jurisdiction has a superior interest in having its policy applied.  
Malatesta
, 275 Ill. App. 3d at 379-80."  
Wreglesworth v. Arctco, Inc.
, 316 Ill. App. 3d 1023, 1031 (2000).  While we are mindful that Horwitz is domiciled and Bankers is incorporated in Illinois, the place of performance is in Illinois, and the suit was brought in Illinois, the core issue remains whether the calculation of the premiums charged to Horwitz constituted a breach of contract on the part of Bankers.  Because the policy was originally issued in Colorado and Horwitz was charged Colorado rates using Colorado tables which were filed with the Colorado Division of Insurance, we find that Colorado has the more significant relationship with the occurrence and the parties and that Colorado law should apply.

Plaintiff next argues that because the filed rate doctrine operates as a preemptive defense and is assertable only as an affirmative defense, its omission from defendant's answer constitutes waiver.  She states, "in order to avoid surprise, [section 2-613] requires affirmative defenses to be expressly set forth in the reply."  
City of Chicago v. Burgard
, 285 Ill. App. 3d 478, 480 (1996).  Accordingly, if the defense is not raised, it is precluded even though it may appear in the evidence.  
Mount States Mortgage Center, Inc. v. Allen
, 257 Ill. App. 3d 372, 381-82 (1993). 

However, as defendant notes, "failure to plead an affirmative defense in the initial answer is not necessarily a waiver."  
Rognant v. Palacios
, 224 Ill. App. 3d 418, 422 (1991).  Rather, section 2-616(a) permits a party to amend its pleadings to include an affirmative defense any time prior to judgment.  Consequently, this court has rejected arguments that affirmative defenses asserted in motions for summary judgment were waived when the defendants failed to include them in their answers.  
Salazar v. State Farm Mutual Automobile Insurance Co.
, 191 Ill. App. 3d 871, 876 (1989).  In doing so, this court has also noted that waiver is particularly inappropriate where the party asserting it has had ample time to respond to the defense and, as a result, has not been unfairly prejudiced.  
Rognant
, 224 Ill. App. 3d at 421-22.

In the present case, the trial court specifically rejected plaintiff's contention that she had been prejudiced.  In response to plaintiff's motion for reconsideration, and following briefing, the court stated:  "I think that there is no procedural waiver.  In any event, I think that [the fact that Bankers has asserted the filed rate doctrine] has not worked a prejudice to plaintiff's side of the case."  Indeed, both cases cited by plaintiff to support her waiver argument involved affirmative defenses that were raised much later than the filed rate doctrine was here.  See 
Dickman v. E.I. DuPont de Nemours & Co.
, 278 Ill. App. 3d 776, 79-81 (1996) (after a bench trial); 
Afshar, Inc. v. Condor Air Cargo, Inc.
, 250 Ill. App. 3d 229, 229-31 (1993) (after the trial had begun).  We find that it was within the discretion of the trial court to allow defendant's motion for reconsideration as well as to allow the affirmative defense in defendant's motion for summary judgment. 

Plaintiff's second claim regarding the filed rate doctrine is that judicial estoppel prohibits Bankers' assertion of the doctrine in its motion for summary judgment.  Specifically, plaintiff alleges that in Bankers' previous answer to the complaint and other affirmative statements, it stated that the filing rates were not relevant.  Accordingly, she continues, Bankers waived the defense, elected a different defense, and should now be estopped to assert otherwise.

At the core of this argument was plaintiff's request in the circuit court for defendant to admit the following:

"In Illinois, applications for premium increases are required to be filed with State authorities before [Bankers] can assess policyholders any premium increase."

Bankers responded:

"Bankers objects to this request as vague, ambiguous, calling for a legal conclusion, and as seeking the admission of a ‛fact' not relevant to this case.  Bankers specifically objects to the following terms as vague and ambiguous: ‛applications,' the unidentified actor in the passive phrase ‛are required to be filed,' ‛State authorities,' ‛assess,' and ‛any premium.'  Without waiving its objections, Bankers denies that it is required by any authority to ‛apply' for premium increases before it changes its premium rates for policies written on its form CR-97N, but admits that it files changes in its tables of rates for policies on its form CR-97N with the Illinois Department of Insurance on an as needed basis." 

Despite this response, defendant argued in its motion for reconsideration that the filed rate doctrine precludes plaintiff from bringing a case due to the fact that it filed its premium increases with the CDOI.

"The doctrine of judicial estoppel provides that when a party assumes a certain position in a legal proceeding, that party is estopped from assuming a contrary position in a subsequent legal proceeding."  
People v. Coffin
, 305 Ill. App. 3d 595, 598 (1999).  The doctrine has five requirements:

"
First
, the two positions must be taken by the same party.  
Second
, the positions must be taken in judicial proceedings.  
Third
, the positions must be given under oath.  
Fourth
, the party taking the positions must have been successful in maintaining the first position, receiving some benefit thereby in the first proceeding.  
Fifth
, the two positions must be totally inconsistent--the truth of one must necessarily preclude the truth of the other." (Emphasis in original.)  
Department of Transportation v. Coe
, 112 Ill. App. 3d 506, 509-10 (1983). 

We find that plaintiff has failed to prove all five requirements.  First, all of the actions and statements upon which plaintiff bases her argument were made in this action, and therefore, the separate proceedings requirement is not met.  Second, plaintiff concedes that defendant did not prevail on any of its other allegedly contradictory positions or receive any benefit from those positions, and therefore, the successful assertion and benefit requirement is not met.  Finally, nothing Bankers said or did was ever inconsistent with the filed rate doctrine.  Because none of Colorado's statutes require defendant to "apply" for increased premium rates, defendant denied plaintiff's statement that "applications for premium rates are required to be filed."  Instead, Bankers specifically admitted that it "files" changes in its rates on an "as needed basis" or, in other words, as required by the applicable statutes and regulations.  Accordingly, Bankers cannot be judicially estopped from asserting this new affirmative defense.    

Plaintiff's last argument regarding the filed rate doctrine is that it should not be extended to her breach of contract or Illinois Consumer Fraud Act claims because it does not satisfy any of the criteria necessary for its proper application, as normally it is a doctrine of utility and shipping rate-setting law – not insurance contract pricing.  This claim directly challenges the trial court's summary judgment holding as legally insufficient and, as previously stated, will be reviewed 
de novo
.  

For a history of the filed rate doctrine, plaintiff cites 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 188, 43 S. Ct. 47, 50 (1922), where the United States Supreme Court held that a private plaintiff could not claim damages under the antitrust laws where the allegedly excessive shipping rates at issue had been filed with the Interstate Commerce Commission (ICC).  In its reasoning, the Court examined the regulatory framework of the Interstate Commerce Act and noted that the regulation allowed the recovery of damages for illegal rates for actions brought to the ICC.  Therefore, the Court concluded that Congress could not have intended that there be an additional remedy of unreasonable rates.  
Keogh
, 260 U.S. at 162, 67 L. Ed. at 187, 43 S. Ct. at 49.  Recovery was barred because the shipper's damages were hypothetical since "no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him.  The benefit might have gone to his customers, or conceivably, to the ultimate consumer."  
Keogh
, 260 U.S. at 164-65, 67 L. Ed. at 189, 43 S. Ct. at 50.

Second, the court found that carrier rate regulation was intended to prevent charging discriminatory rates or rebates which would operate to give preferences over competitors.  
Keogh
, 260 U.S. at 163, 67 L. Ed. at 188, 43 S. Ct. at 50.  The Court's rationale was that uniform treatment of shippers could not be achieved if different measures of relief were available to different shippers in actions.  
Keogh
, 260 U.S. at 163, 67 L. Ed. at 188, 43 S. Ct. at 50.  This doctrine was logically extended from federal regulation to state agency regulation in 
Wegoland Ltd. v. NYNEX Corp.
, 27 F.3d 17 (2d Cir. 1994).

Based upon the unmet criteria of 
Keogh
, plaintiff asserts that this court should not apply the filed rate doctrine to health insurance premiums in Illinois because the most basic rationale for promoting the doctrine is missing here – Horwitz is challenging a premium set on terms not permitted by the contract and is not seeking redress of an illegal rebate or discount.  Further, the doctrine should not be applied because this is not a utility or shipping case (
Wegoland
, 27 F.3d at 18), and the whole rate structure for the industry has not been challenged– only the defendant's actions under the terms of the insurance contract.  In other words, this is not a case of "monopolistic and oligopolistic" industries, where application of the doctrine would protect the consumer by "fostering stability."  
Wegoland
, 27 F.3d at 20.  Indeed, plaintiff argues, because this was filed as a class action, this court should determine that the rationale of uniform treatment overcomes the concern that the trial court cannot fashion appropriate class-wide relief.

Moreover, plaintiff points to the lack of a persuasive regulatory framework as standing for the implication that Congress did not intend that there be an additional remedy, as was present in the ICC in 
Keogh
, to preclude either a private right of action under the Illinois Insurance Code or a common law breach of contract.  Rather, the state insurance commissions do not attempt to occupy the field and instead leave interpretation of policies' renewal language open to court interpretation.  
United States Gas Co. v. Illinois Commerce Commission
, 163 Ill. 2d 1, 26 (1994) (holding that the filed rate doctrine did not apply where the federal statutory scheme did not "occupy the field").

Plaintiff maintains that the state insurance commissions do not attempt to occupy the field or its regulation.  First, plaintiff focuses on the commissions' lack of investigatory review.  For this, she points to defendant's own assertions that it could "charge whatever it wanted," file the rates, and have them stamped.  To this date, plaintiff notes that neither Colorado nor Illinois has objected to these rates.  

Second, plaintiff attempts to distance the facts of this case from those in 
Anzinger v. Illinois State Medical Inter-Insurance Exchange
, 144 Ill. App. 3d 719 (1986).  There, this court held that the plaintiff physicians could not maintain an action under the Illinois Insurance Code to recover premiums paid to their malpractice insurer that were ultimately determined (on judicial review of a determination by the Director of Insurance) to be excessive and discriminatory.  
Anzinger
, 144 Ill. App. 3d at 725.  The present facts, according to plaintiff, can be distinguished because: (1) plaintiff is asserting a breach of contract; (2) there is no mandatory and exclusive statutory scheme regulating appeals and procedure for an affirmative determination by a regulatory agency; and (3) there is no evidence that any regulatory body in this case affirmatively reviewed the reasonableness of Bankers' renewal premiums or that the premiums conform to the language of the policy.

In fact, plaintiff concludes, Illinois and federal case law shows that the filed rate doctrine is inapplicable.  First, she cites 
Euclid Insurance Agencies, Inc. v. American Association of Orthodontists
, No. 95 C 3308 (N.D. Ill. February 5,1998).  There, in a breach of contract claim, the insureds claimed that the defendant breached the agreement by charging excessive premium rates.  The court disposed of the filed rate doctrine and allowed the breach of contract action to proceed:

"The filed rate doctrine, however, does not apply to bar Count III.  In the agreement, [defendant] assented to make ‛adjustments. . . over time based on experience and actuarial calculations.'  The Association [plaintiff] is not challenging the reasonableness of [defendant's] rates.  Rather, the Association is claiming that [defendant] failed to honor its contractual obligation to adjust rates based on experience and actuarial calculations.  Although the reasonableness of  [defendant's] insurance rates and the fact that the rates were governed by regulatory agencies may be factors in deciding this issue, they are not dispositive.  Furthermore, counterclaim defendants cite no statute or case which prohibited or limited [defendant's] ability to fulfill its commitment.  Therefore, a jury must decide if [defendant] complied with the agreement by appropriately adjusting rates.  
Euclid
, slip op. at __.

Similarly, in 
Dickerson v. Life of America Insurance Co.
, 893 F. Supp. 1085 (M.D. Ga. 1995), the district court denied summary judgment to the insurance company in a similar "closed block" case.

Plaintiff also asserts that an action brought under the Illinois Consumer Fraud Act has never been held to have been barred under the filed rate doctrine and that the Consumer Fraud Act does not limit recovery under the filed rate doctrine defense. 

Defendant responds that the filed rate doctrine may be applicable to insurance claims and is not limited to utility and shipping rate-setting law, to monopolistic and oligopolistic industries, or to situations in which state regulators "attempt to occupy the field."
(footnote: 4)  Rather, defendant claims, the doctrine applies whenever the rates in question have been filed with a governmental agency that is charged with regulating those rates.  See 
Arkansas Louisiana Gas Co. v. Hall
, 453 U.S. 571, 578-79, 69 L. Ed. 2d 856, 864-65, 101 S. Ct. 2925, 2930-31 (1981).

For this, defendant greatly stresses this court's decision in 
Anzinger
, where, defendant claims, this court applied the filed rate doctrine to the insurance context without labeling it as such.  This court, defendant argues, adopted the reasoning of a United States Supreme Court decision, which held that "there could be no private right of action for reparations since under the statutory scheme of regulation, it was the agency whose function it was, in the first instance, to determine whether the filed rates were reasonable.  Therefore, * * * to allow any common law right to recover for excess charges would be inconsistent with the commission's primary jurisdiction to determine rates."  
Anzinger
, 144 Ill. App. 3d at 724, citing 
T.I.M.E. Inc. v. United States
, 359 U.S. 464, 3 L. Ed. 2d 952, 79 S. Ct. 904 (1959).  The 
Anzinger
 court continued:

"Under the Insurance Code in Illinois, the legislature has still given the exclusive initial determination of the reasonableness and nondiscriminatory nature of rates charged for medical malpractice insurance to the agency,
 i.e.
, the Director here.  The recognition of an implied right to recover where the rates have been subsequently determined to be excessive and discriminatory would, we believe, as did the Supreme Court in 
T.I.M.E. Inc
., be inconsistent with the purpose of the Act and the specific limited remedies provided under our statutory scheme."  
Anzinger
, 144 Ill. App. 3d at 724-25.

Defendant also points to decisions in other courts that have applied the filed rate doctrine in the insurance context, often to bar the precise relief that plaintiff seeks in the present case.  In the case 
In re
 Empire Blue Cross & Blue Shield Customer Litigation
, 164 Misc. 2d 350, 622 N.Y.S.2d 843 (1994), 
aff'd sub nom.
, 
Minihane v. Weissman
, 226 A.D.2d 152, 640 N.Y.S.2d 102 (1996)
, for example, the plaintiffs alleged that their health insurer had defrauded policyholders by submitting false information in support of the premium rates it filed with the insurance department, and sought damages based on the alleged overpayments under theories of breach of contract and statutory and common law fraud.  The court rejected roughly the same arguments that plaintiff has made here and held that the filed rate doctrine barred those claims.  
Empire Blue Cross
, 164 Misc. 2d at 355, 358-59, 622 N.Y.S.2d at 845, 848-49.  

Similarly, in 
N.C. Steel, Inc. v. National Council on Compensation Insurance
, 347 N.C. 627, 496 S.E.2d 369 (1998), the plaintiffs asserted a statutory fraud claim based upon an alleged scheme by insurers to charge artificially inflated premium rates for workers' compensation coverage.  The court there held that the filed rate doctrine applied to insurance rates and barred the plaintiffs' claims.  
N.C. Steel
, 347 N.C. at 631, 637, 496 S.E.2d at 371-72, 375.  Defendant admits, however, that Colorado courts have yet to apply the filed rate doctrine in the insurance context, although the Colorado Supreme Court has applied it in the utility context (
Public Service Co. v. Public Utilities Comm'n
, 644 P.2d 933, 939 (Colo. 1982)) and the transportation context (
Denver & Rio Grande Western R.R. Co. v. Marty
, 353 P.2d 1095, 1097 (Colo. 1960)).

In distinguishing both the 
Euclid
 and 
Dickerson
 cases cited by plaintiff, Bankers first points out that 
Euclid
, an unpublished trial court decision, appears to hold that the plaintiff's breach of contract claim brought against an insurer for 
failing
 to adjust rates was not barred by the filed rate doctrine and that the portions of 
Euclid
 cited by plaintiff were decided under Missouri law.  
Euclid
, slip op. at __.  Further, defendant notes that, with regard to 
Dickerson
, plaintiff does not rely on the court's opinion in that case, which does not mention the filed rate doctrine.  Instead, plaintiff cites an article that only reported that 
Dickerson
 had been settled and that the defendant had asserted that the plaintiffs' claims were preempted under the fixed rate doctrine.

By contrast, defendant argues that the statutory and regulatory scheme pursuant to which Bankers made its filings in Colorado supports application of the filed rate doctrine.  In particular, the Colorado Insurance Code regulates the business of insurance "to the end that insurance rates shall not be excessive, inadequate, or unfairly discriminatory."  Colo. Rev. Stat. §10-1-101 (1998).  Furthermore, it is the duty of the Commissioner "to assure that [the business of insurance] is conducted in accordance with the laws of this state."  Colo. Rev. Stat. §10-1-108(8) (1998).   

At all times relevant to these facts, Colorado law has required that rates for individual health insurance policies be filed with the Commissioner.  From 1987 until 1992, section 10-8-102 of the Colorado Insurance Code required Bankers to file its rates with the Commissioner and prohibited it from using those rates for 30 days unless the Commissioner approved of them in writing.  Colo. Rev. Stat. §10-8-102(1) (1987).
(footnote: 5)  In 1992, section 10-8-102 was repealed, and section 10-16-107, effective July 1, 1992, took its place.  Colo. Rev. Stat. §10-16-107(1) (1992).  Section 10-16-107(1) expanded the language of section 10-8-102, but retained the filing requirements as well as the requirement of the Commissioner's approval.

Defendant stresses that the regulatory framework present in 
Anzinger
 is also present in Colorado.  In addition to providing the Commissioner with the authority to "approve or disapprove" rate filings by health insurers, the statute also (1) states that rates for any health insurance policy "shall not be excessive, inadequate, or unfairly discriminatory" (Colo. Rev. Stat. §10-1-107(1) (1998)); (2) makes it the Commissioner's duty to investigate violations of the insurance laws of Colorado (Colo. Rev. Stat. §10-1-108(5) (1998)); (3) authorizes the Commissioner to undertake such investigations "as often as the commissioner in the commissioner's sole discretion deems appropriate" (Colo. Rev. Stat. §§10-1-202(3), 10-1-203(1) (1998)); and (4) authorizes the Commissioner specifically to investigate health insurers "to ascertain whether each insurer and every rate used by it complies with the Colorado Insurance Code (Colo. Rev. Stat. §10-16-216(1) (1998)).  The statute further provides that "[a]ny person aggrieved by any rate charged" may file a written complaint with the Commissioner and authorizes the Commissioner, upon such a complaint or upon his own investigation, to order that any violation of any requirement or standard be corrected.  Colo. Rev. Stat. §10-16-216.5(1), (2) (1998).  If such a violation is not corrected and the Commissioner finds that the "rate violates the provisions of this title applicable to it," he may prohibit its further use and order a refund to all policy holders of the excess premiums paid while the unlawful rate was in effect.  Colo. Rev. Stat. §10-16-216.5(3), (4) (1998). 

We agree that plaintiff has distanced herself from the types of plaintiffs present in more traditional filed rate doctrine cases.  Indeed, there is no arguing that she is not a member of a competitive class seeking an unfair rebate, or that her damages are hypothetical, as in 
Keogh
.  However, she has not been able to sufficiently distinguish the CDOI's role in regulating the insurance industry from the role of the regulating bodies of the utility and transportation industries, and she offers no cases to support her contention that the filed rate doctrine is applicable only in "monopolistic or oligopolistic" industries.  As such, our focus then becomes whether the "regulatory framework" of these regulating bodies displays an intention on the part of the Colorado legislature that there be an additional private remedy for the unreasonableness of rates, or whether the regulations sufficiently allow for the recovery of damages for illegal rates for actions brought to those governing bodies.  

It is apparent that all problems with Colorado insurance premiums need to be first addressed with the CDOI, and then on review to the circuit court.  See Colo. Rev. Stat. §§10-16-216.5(1), (2) (1998).  Further, once a rate is found to have been rejected, the CDOI may issue a prohibition of further use of that rate and may order a refund to all policyholders of the excess premiums paid while the unlawful rate was in effect.  Colo. Rev. Stat. §10-16-216.5(3),(4) (1998). See also Colo. Rev. Stat. §10-16-216.5(5) (1998) (for other remedies provided by law).  To the extent that this statutory scheme covers a fairly extensive framework in which an aggrieved party is to proceed against an insurance company for an allegedly illegal claim, we concur with the trial court that the filed rate doctrine precludes a private right of action governing premium rate disputes and that count III should be barred.  

We disagree with plaintiff's suggestion that the filed rate doctrine does not apply because there was no "affirmative approval by the state regulatory agency" or no "investigatory review" of Bankers' rates before they were charged to policyholders.  In 
Anzinger
, the plaintiffs also argued the distinction between "the power to establish and fix rates and * * * the power to disapprove the rate."  
Anzinger
, 144 Ill. App. 3d at 723.  This court stated that "[w]e do not find these distinctions persuasive."  
Anzinger
, 144 Ill. App. 3d at 723.  We went on to find:

"The statute in 
T.I.M.E. Inc.
, similar to the one here, required only that the carrier file its rates for them to become effective and that no prior approval was necessary. * * *  Thus, the Supreme Court held that, even though the rate did not require prior approval before use, since it was the commission's function to determine the reasonableness of the rates charged, it would be contrary to the statutory scheme to allow the courts to retroactively perform this function in an implied right of action for reparations."  
Anzinger
, 144 Ill. App. 3d at 723-24.

We again do not find such a distinction to be persuasive. 

Moreover, we disagree with plaintiff's contention that the filed rate doctrine does not apply to consumer fraud claims because that claim is based on a "statutory enactment."  Importantly, defendant has established that courts have applied the filed rate doctrine to bar statutory consumer fraud claims identical to plaintiff's.  In 
Empire Blue Cross
, for example, the court barred all of plaintiff's claims, explaining that "‛the fact that the remedy sought can be characterized as damages for fraud does not negate the fact that the court would be determining the reasonableness of rates.' [Citation.]  The ascertaining of damages and the determination of a reasonable rate are ‛hopelessly intertwined.'"  
Empire Blue Cross
, 164 Misc. 2d at 358, 622 N.Y.S.2d at 848.  See also 
N.C. Steel
, 347 N.C. at 631, 496 S.E.2d at 371-72.  Lastly, plaintiff's contention that the filed rate doctrine has never been applied to bar a claim under the Consumer Fraud Act is in error: the Seventh Circuit Court of Appeals applied it to bar claims under the Consumer Fraud Act in a case brought by plaintiff's counsel.  
Cahnmann v. Sprint Corp.
, 133 F.3d 484, 490 (7th Cir. 1998), 
cert. denied
, 524 U.S. 952, 141 L. Ed. 2d 737, 118 S. Ct. 2368 (1998).  We agree with defendant that it is not the nature of the relief, nor the name of the cause of action, which triggers the doctrine.  Because the damages sought by plaintiff for consumer fraud would require the court to "ascertain what would be a reasonable rate absent the [alleged] fraud" (
Wegoland
, 27 F.3d at 21), we agree with the trial court that count VI should be barred along with count III.

Plaintiff's next allegation is that counts I and II of her complaint, brought for violations of section 364 of the Illinois Insurance Code, were wrongly dismissed on the basis that a private right of action does not exist under the Insurance Code.  She quotes, "[w]hen a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to a member of the injured class a private right of action."  
Noyola v. Board of Education
, 179 Ill. 2d 121, 130 (1997). 

Because of our holding that plaintiff's policy was a Colorado policy governed by Colorado statutes and regulations, section 364 of the Illinois Insurance Code is inapplicable to plaintiff's policy.  As defendant notes, "an appellee may defend a judgment on review by raising an issue not previously ruled upon by the trial court if the necessary factual basis for the determination was contained in the record."  
American National Bank & Trust Co. v. National Advertising Co.
, 149 Ill. 2d 14, 21 (1992).  Earlier, we ascertained evidence in the record that Colorado law governs plaintiff's policy.  Consequently, a factual basis exists for us to affirm the trial court's dismissal of plaintiff's counts I and II, where Illinois law is inapplicable, even if the trial court did not address the issue.  Whether a private right of action exists under section 364 is something that we need not decide.

Plaintiff's last contention is that the trial court incorrectly ruled on her motion for declaratory judgment on her count V, which alleged that Bankers breached the terms of plaintiff's policy when it increased premium rates more that once during several policy years.
(footnote: 6)  Her claim is based upon the phrase in the renewal premium provision of the policy which states: 

"We may change the premium rates for this policy.  The change may be due to a change in benefits.  Since some benefit amounts are tied to the Consumer Price Index (CPI) for medical/hospital/doctor fees, it's expected that premium and benefit changes will occur each year.  The change may also be due to a new table of rates or an increase in age of a family member.  We can only change the premium if we change it for all policies like yours in your state on a class basis.  We'll tell you in advance of any change in the premium.  The premium for this policy is expected to change each year."

Plaintiff argues that "Bankers' policy contemplates that the premium will cover through each renewal date.  This means – annually."  Further, she asserts that Bankers' "renewal premium" clause states, "the premium for this policy is expected to increase each year," which also means once each year.  It is undisputed that prior to 1991, Bankers raised plaintiff's premiums once a year, on the policy anniversary date.  However, from 1991 until the policy termination, Bankers increased plaintiff's premiums twice a year.  Bankers also concedes that the policy does not expressly authorize or prohibit it from raising premiums more than once a year.

An ambiguity exists when a contract is reasonably susceptible to different constructions, and whether an ambiguity exists is a question of law.  
Rao v. Parvathaneni
, 72 Ill. App. 3d 1, 5 (1979).  Further, if terms are ambiguous, the interpretation is to be construed against the insurance carrier that created the ambiguity.  
United States
 
Fire Insurance Co. v. Schnackenberg
, 88 Ill. 2d 1, 4 (1981).  Plaintiff argues that, given Bankers' own position prior to 1991 as well as the ambiguous language of the policy clause in question, the contract should be read construed in favor of plaintiff's one-increase-per-year interpretation.

"Where no factual issues are raised on appeal, the sole question on review is whether the trial court's entry of summary judgment is proper as a matter of law."  
Spiegel v. Zurich Insurance Co.
, 293 Ill. App. 3d 129, 132 (1997).  As a result, we are to conduct an independent review of this issue.  

Had the renewal premium provision of the contract only contained the language
,
 "[w]e may change the premium rates for this policy" and "[t]he premium for this policy is expected to increase," we would agree with defendant that such language unambiguously states only that premium and benefit changes would occur from time to time.  Because such language portends to say nothing of the frequency or number of changes, defendant's interpretation could be the only reasonable interpretation and no ambiguity would exist.

However, the renewal premium provision does not stop there.  The last sentence of the previously quoted language states that "[t]he premium for this policy is expected to increase 
each
 
year
."  (Emphasis added.)  It has long been held "that no word in a contract is to be considered as mere surplusage and thus meaningless.
"  
Transcon, Inc. v. Motion, Inc.
, 14 Ill. App. 3d 61, 65 (1973).  Indeed, "in construing a contract, meaning and effect must be given to every part, and no part should be rejected as surplusage unless absolutely necessary since it is presumed that each provision was inserted deliberately and for a purpose."  
White v. White
, 62 Ill. App. 3d 375, 378 (1978).  

We interpret the trial court's holding to stand for the position that the renewal premium provision was not ambiguous and that it must be construed as a matter of law to mean that the contract says nothing about the frequency and number of changes to be made in the insurance rate premiums.  Presuming that the words "each year" were inserted deliberately and for a purpose, we judge that plaintiff's interpretation was reasonable, that the contract is ambiguous, and that the trial court erred in granting summary judgment to defendant on count V.  While a finding of ambiguity for the purposes of reversing summary judgment requires a finding that a contractual clause is reasonably susceptible to different constructions, we believe in truth that plaintiff's is the only reasonable interpretation.  It is difficult for us to give any meaning to this last phrase, if it is not a limitation on increases annually.  Indeed, we believe that no reasonable interpretation of the words "each year" could find that increases could occur more than once per year for every year of the life of the contract.  Consequently, we reverse and remand this cause only with respect to count V so that the trial court may entertain questions of fact regarding the inclusion of the phrase "each year."

For the foregoing reasons, we affirm the trial court's grant of summary judgment with respect to counts III and VI and its grant of defendant's section 2-615 motions to dismiss for counts I and II.  However, because we find the renewal premium provision to be ambiguous, we reverse the trial court as to count V and remand for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

QUINN, P.J., and REID, J., concur.

FOOTNOTES
1: 
 Plaintiff has not appealed and did not replead counts IV and VII.  According to Supreme Court Rule 303(b)(2) (155 Ill. 2d R. 303(b)(2)), we have no jurisdiction to review these claims.  See 
Myrda v. Coronet Insurance Co.
, 221 
Ill. App. 3d
 482, 492 (1991).

2:
According to plaintiff's complaint, her premiums were $912 in 1987; $1,004 in 1988; $1,231 in 1989; $1,333 in 1990; $3,293 in 1991; $6,665 in 1993; $11,674 in 1994; and $13,844 in 1995.

3:  
In 
Zook
, the case that plaintiff argues stands for a 
de novo
 review of the trial court's decision to strike or allow an affirmative defense, the trial court did not deny the affirmative defense, but struck it as insufficient as a matter of law.  
Zook
, 268 Ill. App. 3d at 169.  Accordingly, this court reviewed the trial court's decision under a 
de novo
 standard.  
Zook
, 268 Ill. App. 3d at 169.   

4: 
Defendant asserts that the case plaintiff cites for this limitation, 
United States Gas Co. v. Illinois Commerce Commission
, 163 Ill. 2d 1 (1994), was not a private action for damages but rather involved an ICC order directing a natural gas distributor to refund excess wholesale costs to customers.  The issue before that court was the effect of a federal rate regulation on state regulatory authority, something that has no bearing on this case.

5:  
Prior to 1987, other sections of the Colorado Revised Statutes (Colo. Rev. Stat. §72-1 
et seq.
, (1963)) provided a similar regulatory framework under Colorado law.
 

6:  
Defendant concedes that the filed rate doctrine does not apply to plaintiff's count V breach of contract claim, as count V focuses on ambiguities in the insurance contract itself and not the validity of the premium rates charged by defendant.