IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| QWEST CORPORATION, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 2 CA-SA 2002-0046 |
| | ) | DEPARTMENT A |
| HON. JOHN F. KELLY, Judge of the | ) | |
| Superior Court of the State of Arizona, | ) | O P I N I O N |
| in and for the County of Pima, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARK McMAHON, a single man, on | ) | |
| behalf of himself and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| | ) | |

SPECIAL ACTION PROCEEDING

Pima County Cause No. C20012485

RELIEF DENIED

Fennemore Craig
  By Timothy Berg, James D. Burgess                                       Phoenix
    and Barney M. Holtzman                                                 Tucson
                                                              Attorneys for Petitioner


Chandler, Tullar, Udall & Redhair
  By S. Thomas Chandler

    and

Law Office of Bruce A. Burke
  By Bruce A. Burke

Tucson
Attorneys for Real Party in Interest

---

F L Ó R E Z, Judge.

¶1        Real party in interest Mark McMahon, on behalf of himself and others similarly situated, filed a putative class action against Qwest Corporation, the petitioner in this special action, alleging Qwest fraudulently and through misrepresentation had sold him a service he did not need.  McMahon and the class he seeks to represent are residential tenants, as opposed to homeowners, who purchased from Qwest monthly "inside wire" maintenance service for the telephone wire leading from the Qwest service outside their respective rental units to the telephone jacks located on the walls within their units.

¶2        Qwest moved to dismiss the complaint pursuant to Rule 12(b)(1) and (b)(6), Ariz. R. Civ. P., 16 A.R.S., Pt. 1, contending that the Arizona Corporation Commission (Commission) has exclusive jurisdiction to determine this type of dispute, that the superior court lacked jurisdiction to hear it, and that McMahon's complaint failed to state a claim upon which relief could be granted.  The respondent judge denied the motion, and Qwest filed this special action to challenge that ruling.  We are asked to consider the scope of the Commission's exclusive jurisdiction as well as the jurisdiction of the superior court to decide claims against a Commission-regulated public utility such as Qwest.  We conclude that the respondent judge neither abused his discretion nor exceeded his jurisdiction or legal authority by rejecting Qwest's arguments that the

2

Commission has exclusive jurisdiction over McMahon's claims or that the so-called "filed rate doctrine" bars his claims.

## SPECIAL ACTION JURISDICTION

¶3 An order denying a motion to dismiss is an interlocutory, nonappealable order. *Nataros v. Superior Court*, 113 Ariz. 498, 557 P.2d 1055 (1976). *See also Northern Propane Gas Co. v. Kipps*, 127 Ariz. 522, 525, 622 P.2d 469, 472 (1980) ("[T]he proper procedure for appellate review of a motion to dismiss is through a petition for special action."). Nevertheless, an appellate court should accept jurisdiction of a special action challenging the denial of a motion to dismiss only in limited circumstances, such as when the issue raised is of statewide importance. *See Taylor v. Jarrett*, 191 Ariz. 550, 959 P.2d 807 (App. 1998) (absence of personal jurisdiction and fact that issue presented was one of first impression and of statewide importance constituted circumstances providing exception to general rule that special action jurisdiction should not be accepted to determine propriety of denial of motion to dismiss). Both Qwest and McMahon urge us to accept jurisdiction of this special action, claiming the significant threshold questions raised are purely legal and of statewide importance. *See Vo v. Superior Court*, 172 Ariz. 195, 836 P.2d 408 (App. 1992). We agree and therefore accept jurisdiction of this special action. *Cf. U.S. West Communications, Inc. v. Arizona Corp. Comm'n*, 201 Ariz. 242, 34 P.3d 351 (2001) (finding questions relating to obligations of Commission mandated by constitution to be legal questions of statewide importance, warranting acceptance of special action jurisdiction); *Arizona Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 830 P.2d 807 (1992) (propriety of attorney general's refusal to certify rules proposed by Commission and issue regarding Commission's constitutional power to regulate transactions between public service corporations and their affiliates regarded as urgent,

3

purely legal questions of statewide importance, justifying acceptance of Commission's special action petition). But, because we find, as a matter of law, that the respondent judge correctly denied Qwest's motion to dismiss, we conclude that the respondent judge did not abuse his discretion or exceed his jurisdiction or legal authority. Ariz. R. P. Special Actions 3, 17B A.R.S. Accordingly, we deny special action relief. *Cf. Uhlig v. Lindberg*, 189 Ariz. 480, 943 P.2d 840 (App. 1997) (accepting special action jurisdiction of challenge to superior court's order reversing city court's dismissal of criminal charges, but denying relief).

## FACTS AND PROCEDURAL BACKGROUND

¶4        Qwest is a corporation that does business in Arizona, selling telephone and related services throughout the state. McMahon, a residential tenant, and other residential tenants purchased from Qwest wire maintenance service for the inside telephone wire of the leased property.[1] McMahon filed a first amended complaint against Qwest in September 2001, alleging, inter alia, that Qwest had committed consumer fraud by concealing material facts regarding the tenants' need for and the value of the wire maintenance service (count one) and by employing

---

[1]The record contains information regarding the Commission's historical approval of the services, rates, and classifications discussed herein. In 1982, the Commission approved of a settlement between Mountain States Telephone & Telegraph Co., Qwest's corporate predecessor, and various other parties regarding proposed rate increases for intrastate telephone service and related issues. Ariz. Corp. Comm'n Decision No. 53040 (filed May 21, 1982). The Commission approved of Mountain States' offering to customers "options available incident to ownership and maintenance of residential and business inside wiring." *Id*. at 5. The Commission entered various orders thereafter approving rates and classifications related to wire maintenance services for residential and business customers. *See, e.g.*, Ariz. Corp. Comm'n Decision No. 59826 (filed September 16, 1996) (authorizing rate increase for inside wire maintenance plan); Ariz. Corp. Comm'n Decision No. 55426 (filed February 12, 1987) (approving "Linebacker Plus" optional inside wire maintenance program); Ariz. Corp. Comm'n Decision No. 55048 (filed May 29, 1986) (approving tariff offering enhanced wire maintenance service plan, eliminating service charge when problem related to customer's defective equipment).

4

deceptive practices in marketing and selling the service to tenants (count two); it had negligently misrepresented information "[i]n the course of arranging for and charging" tenants (count three); and it had violated A.R.S. § 40-361 by charging "more than a just and reasonable fee for inside telephone wire maintenance" (count four). McMahon is seeking damages for Qwest's alleged tortious conduct and violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 through 1534, as well as injunctive relief, requesting that Qwest be ordered to discontinue its allegedly unlawful practices.

¶5         In November 2001, Qwest moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(1) and (b)(6), Ariz. R. Civ. P. Qwest contended that because it is a utility subject generally to regulation by the Commission, and because the wire maintenance plans it had sold are governed by the Competitive Exchange and Network Services Price Cap Tariff, which Qwest filed with the Commission in accordance with A.R.S. § 40-365, the Commission has exclusive and plenary jurisdiction of all matters raised in the complaint, pursuant to article XV, § 3, of the Arizona Constitution. Qwest asserted at the hearing on its motion that the "[C]ommission has the authority to determine to whom services can be offered and by whom they are purchased."

¶6         Qwest also argued, both in its motion and at the hearing, that the complaint should be dismissed pursuant to the filed rate doctrine. That federal doctrine, the adoption of which Arizona courts have not yet considered, bars an action in a trial court when that action pertains to a tariff that has been filed with and approved by a regulatory commission. *See generally Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S. Ct. 47, 67 L. Ed. 183 (1922) (establishing filed rate doctrine and holding that when Interstate Commerce Commission has

approved railroad rates and found them reasonable and nondiscriminatory, private shipper may not recover damages for loss of benefit of lower rate it would have enjoyed but for conspiracy between carriers fixing rate; finding carrier's published tariff to be the legal rate as between carrier and shipper and that parties' rights cannot be varied or enlarged by contract or tort of carrier, or affected by tort of third party); *see also American Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998) (discussing filed rate doctrine as bar to tort and contract claims arising out of services addressed by tariff on file with Federal Communications Commission).

¶7        McMahon did not contest the dismissal of count four of his first amended complaint, alleging Qwest had violated § 40-361 and had charged him "and all others similarly situated an excessive fee for inside telephone wire maintenance, which is neither a just nor a reasonable fee." But McMahon did oppose the motion as to the remaining counts of consumer fraud and negligent misrepresentation, relying on *Campbell v. Mountain States Telephone & Telegraph Co.*, 120 Ariz. 426, 586 P.2d 987 (App. 1978). There, Division One of this court reversed the trial court's grant of a motion to dismiss and held that traditional claims in tort or contract fall within the general jurisdiction of trial courts, rather than the primary, exclusive jurisdiction of the Commission, even though the claims involve a regulated body or enterprise. McMahon also argued that the filed rate doctrine did not support dismissal of counts one through three. He contended the doctrine has no "place in Arizona law," urging the respondent judge to reject it and follow other jurisdictions that have done so, such as California and Washington. McMahon also argued that, given the nature of his claims and the purposes of the filed rate doctrine, there is no reason to apply it here to bar the complaint in any event.

6

**¶8**          The respondent judge dismissed count four but, relying solely on *Campbell*, he denied the motion as to counts one through three.  This special action followed.

## SUBJECT MATTER JURISDICTION

**¶9**          In article XV of the Arizona Constitution, its framers "established the Commission as a separate, popularly-elected branch of state government."  *State ex rel. Woods*, 171 Ariz. at 290, 830 P.2d at 811.  Section 3 of article XV specifies the powers and duties of the Commission, providing as follows:

> The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations;  Provided, that incorporated cities and towns may be authorized by law to exercise supervision over public service corporations doing business therein, including the regulation of rates and charges to be made and collected by such corporations; Provided further, that classifications, rates, charges, rules, regulations, orders, and forms or systems prescribed or [made] by said Corporation Commission may from time to time be amended or repealed by such Commission.

Section 6 of article XV permits the legislature to "enlarge the powers and extend the duties of the Corporation Commission, and . . . [authorize it to] prescribe rules and regulations to govern proceedings instituted by and before it."  Pursuant to that authority, the legislature has given the Commission a plethora of additional powers, further expanding its constitutional authority.  For example, A.R.S. § 40-202(A) authorizes the Commission to "supervise and regulate every public

7

service corporation in the state and do all things, whether specifically designated in this title or in addition thereto, necessary and convenient in the exercise of that power and jurisdiction." It further provides that the Commission may adopt rules to "[p]rotect the public against deceptive, unfair and abusive business practices, practices related to . . . intrusive and abusive marketing, [and] deceptive or untrue advertising practices." § 40-202(C)(1); *see also* A.R.S. § 40-246(A) (Commission has authority to adjudicate consumer complaints alleging violations "of any provision of law"). The legislature also enacted § 40-365, which requires public service corporations, such as Qwest, to file with the Commission schedules containing rates and charges, rules, regulations, and contracts that affect or relate to rates or services, which the Commission may either reject, approve, or modify.

¶10        Chronicling the history of the provisions of Arizona's constitution relating to the Commission, our supreme court noted in *State ex rel. Woods* that "[t]he framers . . . followed the newest western states in providing a constitutional basis for popular control of corporate regulation by creating an elected commission with broad powers." 171 Ariz. at 291, 830 P.2d at 812. The court recognized that, based on the history of its adoption, the framers intended "to provide both effective regulation of public service corporations and consumer protection against overreaching by those corporations." *Id*. at 290, 830 P.2d at 811. As the court further noted, "the Commission has judicial, executive, and legislative powers. . . . The Commission exercises its executive, administrative function in adopting rules and regulations, its judicial jurisdiction in adjudicating grievances, and its legislative power in ratemaking." *Id*. at 291, 830 P.2d at 812.

¶11        Recognizing that the Commission has broad powers with respect to those matters that fall within its constitutionally or legislatively endowed authority, we must determine here the

breadth of the Commission's exclusive jurisdiction. And, we must identify those matters over which the superior court may exercise concurrent jurisdiction. Implicit in the respondent judge's denial of Qwest's motion to dismiss and his reliance on *Campbell* is the finding that the superior court had, at the very least, concurrent jurisdiction with the Commission to hear claims of consumer fraud and negligent misrepresentation. We conclude the respondent judge was correct.

¶12    The Commission has the exclusive power to exercise the duties given to it in article XV, § 3. *State v. Tucson Gas, Elec. Light and Power Co.*, 15 Ariz. 294, 138 P. 781 (1914). More specifically, it "has full and exclusive power in the field of prescribing rates which cannot be interfered with by the courts, the legislature or the executive branch of state government." *Morris v. Arizona Corp. Comm'n*, 24 Ariz. App. 454, 457, 539 P.2d 928, 931 (1975); *see also Southwest Gas Corp. v. Arizona Corp. Comm'n*, 169 Ariz. 279, 283, 818 P.2d 714, 718 (App. 1991) (with respect to ratemaking decisions that affect public services corporations, "the Commission is given full and exclusive powers to the preclusion of interference by the other branches of government"); *Arizona Pub. Serv. Co. v. City of Phoenix*, 149 Ariz. 61, 64, 716 P.2d 430, 433 (App. 1986) ("[C]ommission has exclusive ratemaking authority, not to be invaded by any branch of government."). Thus, as part of its executive and legislative function, the Commission has the exclusive, plenary authority to determine what is just and reasonable in terms of services offered by a public service corporation and the rates charged for such services. *Tucson Elec. Power Co. v. Arizona Corp. Comm'n*, 132 Ariz. 240, 645 P.2d 231 (1982).

¶13    As this court stated in *State ex rel. Corbin v. Arizona Corp. Comm'n*, 174 Ariz. 216, 218, 848 P.2d 301, 303 (App. 1992), "[t]he [C]ommission's power goes beyond strictly setting rates and extends to enactment of the rules and regulations that are reasonably necessary

9

steps in ratemaking." In addition to this executive and legislative authority, the Commission has the judicial jurisdiction to hear grievances and consumer complaints. *State ex rel. Woods*; *Southwest Gas Corp*. Not only does the Commission have judicial powers that are "inherent in its responsibility to make those decisions necessary to regulate public service corporations, pursuant to Article 15, Section 3, of the Arizona Constitution," *Southwest Gas Corp*., 169 Ariz. at 284, 818 P.2d at 719, as previously noted, the legislature has expanded that authority by expressly authorizing it to address consumer complaints, including those that involve allegations of deceptive business and marketing practices. A.R.S. §§ 40-110, 40-202(C). With respect to matters solely and directly involving questions of the reasonableness of services, rates, and the classification of services, the Commission's authority is exclusive and plenary. *See Tucson Elec. Power Co.*, 132 Ariz. at 242, 645 P.2d at 233. But, claims such as McMahon's that are unrelated to or attenuated from those matters over which the Commission has express constitutional or statutory authority do not fall within the Commission's exclusive jurisdiction. *Campbell* supports our conclusion.

¶14     The question raised in *Campbell* was whether the constitution, A.R.S. §§ 40-241 and 40-321,[2] or the doctrine of primary jurisdiction required the plaintiff to present tort and breach of contract claims against Mountain States Telephone & Telegraph Company (Mountain States) to the Commission before she could file a lawsuit alleging those claims in superior court. The plaintiff sought damages against Mountain States for breach of contract based on its failure to

---

[2]Section 40-241 gives the Commission the power to conduct investigations and hearings and to inspect the records of a public service corporation. Section 40-321 gives the Commission the power to oversee a public service corporation's business and ensure that it is conducting business in a safe, reasonable, and proper manner.

10

deliver uninterrupted telephone service, resulting in losses of income and business. Additionally, she alleged Mountain States had intentionally refused to provide her with unintercepted and uninterrupted telephone service and that it had intentionally caused her to suffer emotional distress by intercepting and interrupting her telephone service, though it knew or should have known she would suffer such distress as a result. She sought compensatory damages for her loss of income and business, aggravation, mental and physical suffering, inconvenience, distress, and aggravation of physical condition, as well as punitive damages. Lastly, the plaintiff sought damages resulting from Mountain States' invasion of her privacy and intrusion into her personal life by monitoring and intercepting her telephone calls and conversations. The trial court dismissed the complaint on the ground that the plaintiff was required to present her claims to the Commission first, essentially finding that she had failed to exhaust her administrative remedies. Reversing, Division One of this court held that the Commission did not have exclusive, primary jurisdiction of the plaintiff's tort and breach of contract claims.

¶15        The court in *Campbell* first distinguished the doctrine of exhaustion of remedies from the question of jurisdiction, pointing out that "'[t]he exhaustion doctrine is concerned with the timing of judicial review of administrative action.' The doctrine applies only when an administrative agency has original jurisdiction." 120 Ariz. at 429, 586 P.2d at 990, *quoting* 3 Kenneth C. Davis, *Administrative Law Treatise* § 20.01 at 57 (1958). The court found that because the superior court had not been asked to review any action of or decision by the Commission, the exhaustion of remedies doctrine was not relevant. The court then turned to the question of whether the Commission had primary jurisdiction of the claims alleged in the complaint.

11

¶16 The court stated: "[t]he doctrine of primary jurisdiction determines whether the court or the agency should make the initial decision in a particular case." *Campbell*, 120 Ariz. at 429, 586 P.2d at 990. The doctrine "is a discretionary rule created by the courts to effectuate the efficient handling of cases in specialized areas where agency expertise may be useful." *Id*. at 430, 586 P.2d at 991. The court explained that the purpose of the doctrine is to provide guidance to a court in determining whether to "refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court." *Id*. at 429, 586 P.2d at 990, *quoting* Davis, *supra*, § 19.01 at 3-5 (footnotes omitted). The court added, "'[t]he doctrine of primary jurisdiction is not an inflexible mandate but rather is predicated on an attitude of judicial self-restraint, and is generally applied when the court believes that considerations of policy recommend that the issue be left to the administrative agency for initial determination.'" 120 Ariz. at 430-31, 586 P.2d at 991-92, *quoting Greeves v. Idaho Tel. Co.*, 499 P.2d 1256, 1258 (Idaho 1972).

¶17 In determining whether the Commission had primary jurisdiction in *Campbell*, Division One examined the plaintiff's claims in light of the following test articulated by the Supreme Court in *Far East Conference v. United States*, 342 U.S. 570, 574-75, 72 S. Ct. 492, 494, 96 L. Ed. 576, 582 (1952):

> [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised,

12

by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

¶18 In *Campbell*, the court rejected Mountain States' contention that the plaintiff's claims, "though nominally sounding in contract and tort, really concerned the adequacy of appellees' services as public service corporations," and were, therefore, within the Commission's exclusive jurisdiction. 120 Ariz. at 428-29, 586 P.2d at 989-90. The court acknowledged the Commission has broad constitutional power to regulate public service corporations, noting article XV, § 3, of the Constitution gives the Commission the authority to regulate rates and charges, and that article XV, § 4, gives it the power to conduct hearings and investigate grievances and complaints. The court noted, too, that the legislature had enlarged the constitutionally granted powers of the Commission, such as, for example, giving it the power to address "'insufficient' practices." 120 Ariz. at 431, 586 P.2d at 992, *quoting* A.R.S. § 40-203; *see also* A.R.S. § 40-241 (giving the Commission power to investigate claims and inspect the records of public service corporations); § 40-202(A) (providing Commission with power to supervise and regulate public service corporations); § 40-110 (establishing consumer services section for the purpose of receiving and investigating consumer complaints and providing public with information). But the court concluded nevertheless that the superior court had jurisdiction and had erred by dismissing the complaint. The court stated:

In this case, appellees have consistently argued that appellant's complaint is concerned only with the technical manner and means of providing telephone service. Were appellees' contentions supported by the complaint, we would have no trouble in affirming dismissal of the complaint on the ground of primary jurisdiction since questions involving only the manner and means of

13

providing telephone service raise "issues of fact not within the conventional experience of judges," *Far East Conference, supra*, 342 U.S. at 574, 72 S.Ct. at 494, but within the duties and expertise of the Corporation Commission.

Despite appellees' contentions, however, appellant's complaint deals with much more than the mere manner and means of providing telephone service. As our summary of the complaint above indicates, appellant has proffered three claims in tort—for tortious interference with telephone service, intentional infliction of emotional distress, and invasion of privacy—and one claim for breach of contract. Obviously, each of these claims is elementally based on the manner and method of providing service, and other matters within the particular expertise of the Corporation Commission. However, the claims' most important aspects involve facts and theories of tort and contract far afield of the Commission's area of expertise and statutory responsibility. Indeed, appellant's tort and contract claims are the type of traditional claims with which our trial courts of general jurisdiction are most familiar and capable of dealing.

120 Ariz. at 431-32, 586 P.2d at 992-93.

¶19    Thus, even though the plaintiff's claims in *Campbell* involved the adequacy and method of telephone service, those issues were not predominant. The court noted, too, that the plaintiff was "not seeking injunctive relief to establish broad public doctrines, or rights to service or levels of service." 120 Ariz. at 432, 586 P.2d at 993. Rather, the plaintiff had raised "relatively simple tort and contract issues revolving around a central inquiry: whether, under traditional judicial principles, appellees committed a civil wrong against appellant." *Id*. The court concluded that the Commission did not have exclusive jurisdiction over such claims. *Id*.

¶20    Qwest contends the respondent judge "misread" *Campbell*, insisting that the case "does not deal with the scope of the exclusive and plenary jurisdiction of the Commission." Qwest asserts that in *Campbell* the court addressed the issue of primary jurisdiction, pointing out,

14

as we have, that it is discretionary. Qwest maintains that *Campbell* is distinguishable not only because it involved issues over which the Commission and the superior court had nonexclusive jurisdiction, but because the nature of the claims in that case, in contrast to the claims here, brought the case outside the exclusive jurisdiction of the Commission. We disagree.

¶21 Although it is true that the court in *Campbell* repeatedly referred to the issue as one of primary jurisdiction, the court ultimately concluded that, given the nature of the plaintiff's claims, it would not "apply the discretionary doctrine of primary jurisdiction so as to vest *exclusive* primary jurisdiction in the Corporation Commission." 120 Ariz. at 432, 586 P.2d at 993. Additionally, here, as in *Campbell*, questions concerning the charge for, nature, and quality of the services Qwest sold "are not [the] predominant" issues. *Id*. The only count directly related to the reasonableness of the fee charged for the wire maintenance service was dismissed. With respect to the claims for consumer fraud, a statutorily defined tort, and negligent misrepresentation, a traditional, common law tort, the reasonableness of the fee charged and the quality or nature of the service sold is wholly irrelevant or, at most, entirely attenuated from the predominant issues.

¶22 Indeed, Qwest concedes in its special action petition that "[t]he gravamen of [McMahon's] claims is that Qwest is selling an inside wire maintenance service that it should not be allowed to sell to residential tenants because it is of no value to them." It summarily concludes, however, that "[s]uch a claim falls within the exclusive jurisdiction of the Commission to make classifications concerning the customers to whom a service can be sold and to determine a reasonable rate for the service." But the factual allegations in McMahon's complaint and the very nature of consumer fraud and negligent misrepresentation claims make it clear that the claims have

15

little, if anything, to do with classifications of customers and assessment of the reasonableness of the rate for that service. McMahon alleged, for example, that Qwest committed consumer fraud, violating the Arizona Consumer Fraud Act, §§ 44-1521 through 1534, by withholding and concealing material facts "regarding the value of the service in light of the frequency with which inside telephone wire maintenance or repair is actually needed." McMahon also alleged that Qwest had concealed from tenants the fact that "by law the tenant's landlord is responsible for maintaining the tenant's inside telephone wire," thereby engaging in deceptive practices. Finally, McMahon alleged Qwest had "negligently misrepresented th[e] service" by concealing information and deceptively marketing a product the tenants did not need.

¶23        The only information in the record with which we have been provided pertaining to classification of services is the information in the Competitive Exchange and Network Services Price Cap Tariff, which distinguishes business from residential customers, providing different service plans for each classification and price structures that vary with the kind of service.[3] The classifications recognized in the tariff differentiate between services provided to businesses and

---

[3]The tariff distinguishes between complex and noncomplex wiring. "Complex Premises Wire" is defined as "[w]iring and jacks on a premises that is associated with customer-provided equipment such as Multiline Telephone Systems, PBX Systems, Multifunction Systems, LAN and data equipment . . . ." "Noncomplex Premises Wire" is defined as "[w]iring and jacks on the customer's side of the Network Interface that does not terminate in customer-provided equipment described under Complex Premises Wire." Other examples of classifications include the different services offered for the two primary classifications of business and residence maintenance plans. Within the residence classification, however, there is no distinction between tenants and homeowners. The only mention of such a distinction is for business customers; the tariff provides a service solution for a "Building Owner/Tenant," that provides multiple lines at specified monthly rates, depending upon the number of lines.

residences. Nothing in McMahon's complaint even remotely relates to this classification system or challenges it in any respect.

¶24    Thus, even though the Commission may well have the constitutional or statutory authority to address and order redress for McMahon's claims, that does not mean its jurisdiction of such claims is exclusive and that the superior court does not have, at the very least, concurrent jurisdiction. Nor does the fact that McMahon is seeking injunctive relief establish, as Qwest contends, that the Commission has exclusive jurisdiction of McMahon's claims. McMahon alleged that the injuries he and other tenants had suffered were likely to recur in the absence of a court order enjoining Qwest from continuing its unlawful practices, asking the court to "grant appropriate injunctive relief." This is not the kind of injunctive relief concerning broad public policy the court in *Campbell* suggested might place an issue squarely within the primary, exclusive jurisdiction of the Commission.

¶25    We conclude that the respondent judge's reliance on *Campbell* was not misplaced. As in *Campbell*, McMahon's complaint raises claims that revolve "around a central inquiry: whether, under traditional judicial principles, [Qwest] committed a civil wrong against [the tenants]."[4]   120 Ariz. at 432, 586 P.2d at 993. Likewise, as in *Campbell*, "these issues predominate, [therefore] it is clearly not essential for the courts to 'refrain from exercising (their) jurisdiction until after' the specialized administrative agency 'has determined some question or some aspect of some question arising in the proceeding before the court.'" *Id.*, *quoting* Davis,

---

[4]We note that here, unlike in *Campbell*, two of the claims, though sounding in tort, are statute based:  counts one and two for consumer fraud, pursuant to A.R.S. §§ 44-1521 through 1534.

17

*supra*, § 19.01 at 3. Based on *Campbell*, as well as the other authorities discussed herein regarding the Commission's constitutional and statutory authority, the allegations in McMahon's complaint, and the nature of his claims against Qwest, the respondent court judge did not err in denying Qwest's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Ariz. R. Civ. P.

## THE FILED RATE DOCTRINE

¶26 Qwest contends, alternatively, that even if the superior court has subject matter jurisdiction of McMahon's complaint, the respondent judge erred in any event by denying its motion to dismiss the complaint, arguing McMahon's claims are barred by the filed rate doctrine. Although the respondent judge made no specific findings of fact or conclusions of law related to this affirmative defense, it rejected it implicitly by denying the motion to dismiss after the argument was made both in the motion itself and at the hearing. Again we disagree with Qwest and find the respondent judge did not err.

¶27 The filed rate doctrine appears to have had its inception in *Keogh v. Chicago & Northwestern Railway Co. See also Kansas City Southern R.R. v. Carl*, 227 U.S. 639, 33 S. Ct. 391, 57 L. Ed. 683 (1918) (discussing tariff filed with regulatory commission and prevention of discrimination among customers by monopolistic transportation and communications companies). The plaintiff in *Keogh* had filed an action in federal district court alleging that the defendant shipping carrier had conspired with other carriers to fix freight transportation rates in violation of federal antitrust laws and that he had been forced to pay higher, unreasonable rates as a consequence of that conspiracy. The Court held that because the rate the defendant had charged the plaintiff had been filed with and approved by the Interstate Commerce Commission (ICC), the

18

district court should have dismissed the complaint for failure to state a claim upon which relief could be granted. The Court reasoned that by approving and fixing the rate, the ICC had determined the rate was reasonable and nondiscriminatory; its decision was dispositive of the issues raised in the lawsuit, notwithstanding the allegations that the filed rate was the product of a conspiracy to inflate prices. The Court held that courts should not be permitted to question and change approved rates because it could result in the charging of different rates to members of the same class of rate payers. The Court added that if the judiciary were allowed to decide whether a rate was reasonable and nondiscriminatory, it would "reconstitut[e] the whole rate structure for many articles moving in an important section of the country." 260 U.S. at 164, 43 S. Ct. at 50, 67 L. Ed. at 188.

¶28  About thirty years later, in *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S. Ct. 692, 95 L. Ed. 912 (1951), the Court again applied the filed rate doctrine, rejecting a challenge to electricity rates that had been approved by the ICC, notwithstanding the plaintiff's allegations that rates were unreasonably high as a result of a fraudulent agreement between directorates of two companies. The Court explained that it was not for courts to determine what is a reasonable rate for utilities, and that the plaintiff had raised a nonjusticiable issue that was more appropriately presented to and determined by the ICC.

¶29  The Court refined the filed rate doctrine in *Arkansas Louisiana Gas Co. v. Hall* *("ARKLA")*, 453 U.S. 571, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981). It held that the doctrine barred an action by the Arkansas Louisiana Gas Company against the defendant for breach of contract, which sought to enforce the defendant's agreement to pay the gas company a higher rate for gas if the defendant were to purchase it from another company for an amount that exceeded

19

the rate the two had agreed upon in their contract. Quoting the decision of the Court of Appeals for the District of Columbia, the Court identified one of the "'considerations underlying the [filed rate] doctrine [as] . . . preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.'" *Id*. at 577-78, 101 S. Ct. at 2930, 69 L. Ed. 2d at 864. The Court regarded the doctrine as a means of preserving uniformity in rates charged. But, perhaps more importantly, the Court viewed the doctrine as a means of avoiding discrimination among rate payers. The Court refused to enforce the rate agreed to by the parties because it differed from the rate that had been filed with and approved by the ICC.

¶30        These and other authorities identify two underlying purposes of and motivations for the filed rate doctrine: prevention of price discrimination among rate payers, referred to as the antidiscrimination strand, and preservation of the role of regulatory agencies in deciding reasonable rates for public utilities and services, or the nonjusticiability strand. *See*, *e.g.*, *Maislin Indus. U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S. Ct. 2759, 111 L. Ed. 2d 94 (1990) (involving antidiscrimination strand; dismissing claim based on allegation that defendant had quoted plaintiff lower rate, which plaintiff sought to enforce, rather than filed rate); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S. Ct. 1922, 90 L. Ed. 2d 413 (1986) (involving nonjusticiability strand; the court refused to determine lower rate by taking into account defendants' alleged wrongful inflation of rate through antitrust violation).

¶31        As the Second Circuit Court of Appeals noted in *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20-21 (2d Cir. 1994):

20

> The [filed rate] doctrine is designed to insulate from challenge the filed rate deemed reasonable by the regulatory agency. Congress and state legislatures establish regulatory agencies in part to ensure that rates charged by generally monopolistic and oligopolistic industries are reasonable. This regime protects consumers while fostering stability. The regulatory agencies are deeply familiar with the workings of the regulated industry and utilize this special expertise in evaluating the reasonableness of rates. The agencies' experience and investigative capacity make them well-equipped to discern from an entity's submissions what costs are reasonable and in turn what rates are reasonable in light of these costs.

> If courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system. For only by determining what would be a reasonable rate absent the fraud could a court determine the extent of the damages. And it is this judicial determination of a reasonable rate that the filed rate doctrine forbids.

¶32 Qwest relies extensively on *Wegoland* for the proposition that, although at its inception the filed rate doctrine was a federal doctrine based on federal tariffs and the powers of federal regulatory agencies, it should be adopted in this state. Indeed, the district court, which court's decision the Second Circuit affirmed with approval, had stated, "[a]lthough *Keogh* pertained to federal regulation, *Keogh*'s rationale applies equally strongly where state law creates a state agency and statutory scheme pursuant to which the state agencies determine reasonable rates." *Wegoland v. NYNEX Corp.*, 806 F. Supp. 1112, 1116 (S.D.N.Y. 1992), *aff'd*, 27 F.3d 17; *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485 (8th Cir. 1992) (finding no reason to distinguish between rates promulgated by state and federal agencies); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (finding that when legislature has given power to administrative agency to determine reasonableness of rate, consumer may not assert another rate as the legal rate under filed rate doctrine, "which . . . applies with equal force to preclude

21

recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one"). Qwest also cites cases from a number of state courts adopting the doctrine.[5]

¶33         Among the cases upon which Qwest relies is *Sun City Taxpayers' Association v. Citizens Utilities Co.*, 847 F. Supp. 281 (D.Conn. 1994), *aff'd*, 45 F.3d 58 (2d Cir. 1995). As Qwest correctly points out, the Second Circuit Court of Appeals approved the district court's conclusion that Arizona's constitution, which gives the Commission exclusive authority to set the rates of public utilities, essentially codifies the filed rate doctrine. But *Sun City* is a federal case by a circuit court different from the one that serves Arizona. Furthermore, like the other authorities that Qwest relies upon and that we discuss below, *Sun City* is distinguishable; there, unlike here, the plaintiff was challenging Commission-approved utility rates, claiming the rates were approved because of the submission of false information. Again, McMahon is not challenging the reasonableness of the approved fees or classification.

---

[5]*See*, *e.g.*, *Emperor Clock Co., Inc. v. American Tel. & Tel. Corp.*, 727 So. 2d 41 (Ala. 1998); *Cullum v. Seagull Mid-South, Inc.*, 907 S.W.2d 741 (Ark. 1995); *Day v. American Tel. & Tel. Corp.*, 74 Cal. Rptr. 2d 55 (Ct. App. 1998); *Public Serv. Co. of Colo. v. The Public Utilities Comm'n of Colo.*, 644 P.2d 933 (Colo. 1982); *Watergate East, Inc. v. D.C. Pub. Serv. Comm'n*, 662 A.2d 881 (D.C. 1995); *Horwitz v. Bankers Life and Cas. Co.*, 745 N.E.2d 591 (Ill. App. Ct. 2001); *but see United States Gas Co. v. Illinois Commerce Comm'n*, 643 N.E.2d 719 (Ill. 1994); *Teleconnect Co. v. U.S. West Communications, Inc.*, 508 N.W.2d 644 (Iowa 1993); *Amundson & Assocs. Art Studio, Ltd. v. National Council on Compensation Ins., Inc.*, 988 P.2d 1208 (Kan. Ct. App. 1999); *Bauer v. Southwestern Bell Tel. Co.*, 958 S.W.2d 568 (Ct. App. 1997); *In re System 99*, 847 P.2d 741 (Nev. 1993); *Porr v. NYNEX Corp.*, 230 A.2d 564 (N.Y. App. Div. 1997); *Lupton v. Blue Cross and Blue Shield of North Carolina,* 533 S.E.2d 270 (N.C. Ct. App. 2000); *Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687 (Tex. App. 1996); *Hardy v. Claircom Communications Group, Inc.*, 937 P.2d 1128 (Wash. Ct. App. 1997). Some of these cases are distinguishable by the fact that they involved federal regulatory agencies. *See*, *e.g.*, *Day* (Federal Communications Commission); *Utilities Comm'n of Colo.* (Federal Energy Regulatory Commission); *Hardy* (Federal Communications Commission).

¶34 Although there is ample authority in favor of adopting the filed rate doctrine, there is persuasive authority to the contrary. *See*, *e.g.*, *Pink Dot Inc. v. Teleport Communications Group*, 107 Cal. Rptr. 2d 392 (Ct. App. 2001); *Spielholz v. Superior Court*, 104 Cal. Rptr. 2d 197 (Ct. App. 2001); *see also United States Gas Co. v. Illinois Commerce Comm'n*, 643 N.E.2d 719 (Ill. 1994) (holding that when federal statutory scheme does not occupy field, filed rate doctrine does not apply); *Tenore v. American Tel. & Tel. Wireless Servs.*, 962 P.2d 104 (Wash. 1998) (distinguishing *Hardy v. Claircom Communications Group, Inc.*, 937 P.2d 1128 (Wash. Ct. App. 1997) and finding filed rate doctrine not implicated in action for fraud and deceptive practices). Moreover, we find it significant that in *Campbell*, Mountain States apparently did not raise, and the court did not mention, the filed rate doctrine after thoroughly discussing the Commission's jurisdiction and finding the judiciary does have the authority to address and is capable of resolving traditional tort and breach of contract claims, even if one of the parties is a regulated utility.

¶35 We need not determine, however, whether Arizona should adopt this federal doctrine and apply it when a state regulatory agency is involved because, even if it were to be adopted, it would not bar McMahon's claims. *See Satellite Sys., Inc. v. Birch Telecom of Okla., Inc.*, 51 P.3d 585 (Okla. 2002) (refusing to decide whether to adopt state version of federal filed rate doctrine for tariffs filed with the Oklahoma Corporation Commission but finding that even if doctrine were to be adopted, it could not bar claim for common law fraud). The respondent trial judge did not err by denying Qwest's motion to dismiss McMahon's complaint based on the failure to state a claim upon which relief may be granted, given the nature of the allegations in McMahon's complaint.

¶36　　　　Neither the antidiscrimination nor the nonjusticiability strand of the filed rate doctrine is implicated by McMahon's claims. First, the antidiscrimination strand is not implicated. There is no claim, direct or otherwise, that Qwest has charged rates in a discriminatory manner or given preferential treatment to different classes of consumers. Nor has one consumer been given a privilege or other benefit that another has not received. *See, e.g., American Tel. & Tel. Co. v. Central Office Tel., Inc.*; *Marcus v. American Tel. & Tel. Corp.*, 138 F.3d 46 (2d Cir. 1998). McMahon and the putative class members are all tenants; all were allegedly sold the same wire maintenance service for the same rate. Neither the rate nor the quality of the service is at the heart of McMahon's complaint. Rather, it is the very fact that Qwest sold to the tenants, through allegedly fraudulent and deceptive practices and material misrepresentations of fact, a wire maintenance service that Qwest knew or should have known tenants did not need.

¶37　　　　Nor do McMahon's claims implicate the nonjusticiability strand of the filed rate doctrine. Again, the claims relate to the marketing and selling of a product to consumers that they may not have needed; the claims have nothing to do with the reasonableness of the rate charged for the services, the kinds of services offered and sold, or the classification of consumers. Nothing in the record permits us to conclude that, by approving the Competitive Exchange and Network Services Price Cap Tariff on July 30, 2001, and subsequent changes in prices and services, the Commission also approved, implicitly or otherwise, the sale of wire maintenance service plans to tenants who did not need them. Indeed, as previously stated, tenants are not distinguished from other residents, and therefore, such a classification was not even arguably part of the tariff that was submitted and approved. There is no appreciable danger here that by allowing the respondent judge to proceed with the underlying lawsuit we will be sanctioning

24

judicial intervention in the rate-making process, a matter solely within the discretion and judgment of the Commission. *See Marcus*, 138 F.3d at 58 (nonjusticiability strand of filed rate doctrine is designed to keep courts out of the rate-making process).

¶38     As the court stated in *H.J.*, it is not the conduct of the defendant that controls "whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." 954 F.2d at 489. Permitting McMahon's claims to proceed, particularly in the absence of the one claim that did challenge the reasonableness of the rates, will have no effect on the Commission's ability to set rates in the telecommunications industry. In this respect McMahon's claims are similar to those of the plaintiffs in *Day v. American Telephone & Telegraph Co.*, 74 Cal. Rptr. 2d 55 (Ct. App. 1998), a case that Qwest cites as an example of a state court that has adopted the filed rate doctrine. There, the court distinguished claims involving unfair business practices and deceptive advertising in the sale of prepaid telephone cards from a challenge to the rate approved by and filed with the Federal Communications Commission. The rate included the practice of rounding up to the nearest minute for time expended with the use of the card. The court found that because the plaintiff was neither seeking monetary relief nor a rate different from the approved rate, but was asking instead that the court enjoin misleading or deceptive practices, the claims were not barred by the filed rate doctrine. Similarly, McMahon is challenging allegedly deceptive and fraudulent sales and marketing practices, not the rate charged to tenants for the wire maintenance service.

¶39     We find distinguishable other authorities Qwest relies on as its primary support for the proposition that claims such as those raised here are barred by the filed rate doctrine. In

*Central Office Telephone*, for example, the Supreme Court reversed the Ninth Circuit Court of Appeals and held that the filed rate doctrine barred the plaintiff's state claims for breach of contract and interference with contracts. Central Office Telephone (COT) had filed an action against AT&T, arguing that the latter had promised to deliver services and provide billing options to it in addition to those that were part of the tariff approved by the Federal Communications Commission under the Communications Act of 1934. The Court held that the rate filed was the only lawful rate that could be charged, even assuming that the carrier had intentionally misrepresented its rate and that COT had relied on those misrepresentations. Because *Central Office Telephone* involved service and billing, which were part of the services package approved of by the regulatory agency, the nondiscrimination strand of the filed rate doctrine was clearly implicated. To permit a carrier to provide services that differed among customers, based on a private agreement giving one greater privileges than others, would sanction discriminatory rates.

¶40        *Wegoland*, too, is distinguishable. Finding barred common law causes of action for fraud, negligent misrepresentation, as well as claims for RICO violations, the Second Circuit Court of Appeals approved the district court's dismissal of the plaintiff's complaint. The plaintiff alleged that the defendants had provided consumers with misleading financial information in order to support inflated rates the defendants had requested, and as a consequence, rate payers and regulatory agencies had been misled into believing that higher rates were justified. But again, at issue in *Wegoland* was the reasonableness of rates approved by the regulatory agency. Although the court acknowledged the result was harsh, it made clear that once a rate is filed and approved, it "is per se reasonable and unassailable in judicial proceedings brought by ratepayers." 27 F.3d at 18. The court rejected the plaintiff's request to make an exception for fraud. Again, McMahon

26

is not challenging the reasonableness of the rates or the quality of the service or the classification of the services, either directly or indirectly. The nonjusticiability strand of the filed rate doctrine is not implicated here, as it was in *Wegoland*.

¶41     Likewise, *ARKLA* is distinguishable from this case because it involved an attempt to avoid payment of an approved rate. There, the plaintiff had alleged that certain rates had been approved because of fraud perpetrated upon the regulatory commission. So, too, is *Marcus* distinguishable. There, AT&T customers had sued the company alleging that it fraudulently had concealed the practice of billing for residential services by rounding up time used to the next full minute. The complaint alleged deceptive acts and practices, false advertising, fraud and deceit, negligent misrepresentation, breach of warranty, and unjust enrichment. And, unlike the plaintiff in *Day*, the AT&T customers in *Marcus* were seeking monetary relief. The Second Circuit Court of Appeals found these claims barred by the filed rate doctrine because the practices complained of had been part of the rate package submitted to and approved by the Federal Communications Commission. The court held that the filed rate doctrine applied "strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue." *Marcus*, 138 F.3d at 59. Accordingly, even if we were to adopt the filed rate doctrine here, neither of its strands compels or justifies dismissal of McMahon's complaint.

## CONCLUSION

¶42    The respondent judge did not err in denying Qwest's motion to dismiss McMahon's complaint pursuant to either Rule 12(b)(1) or (b)(6).  Although we accept jurisdiction of Qwest's special action, we conclude that the respondent judge did not abuse his discretion or exceed his jurisdiction or legal authority, and therefore, we deny relief.


_____

M. JAN FLÓREZ, Judge

CONCURRING:


_____

J. WILLIAM BRAMMER, JR., Presiding Judge


_____

JOHN PELANDER, Judge