

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2014 JUN 23 AM 9: 15

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| MCCARTHY FINANCE, INC., a Washington corporation; MCCARTHY RETAIL FINANCIAL SERVICES, LLC, a Washington limited liability company; HEMPHILL BROTHERS, INC., a Washington corporation and its affiliates and subsidiaries, J.A. JACK & SONS, INC., a Washington corporation, and LANE MT. SILICA CO., a Washington corporation; PUCKETT & REDFORD, PLLC, a Washington professional limited liability company; and ANNETTE STEINER, a single person,<br><br>Appellants,<br><br>v.<br><br>PREMERA, a Washington corporation, PREMERA BLUE CROSS, a Washington corporation, LIFEWISE HEALTH PLAN OF WASHINGTON, a Washington corporation; and WASHINGTON ALLIANCE FOR HEALTHCARE INSURANCE TRUST, and its Trustee, F. BENTLEY LOVEJOY,<br><br>Respondents. | No. 69848-6-I<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>PUBLISHED OPINION<br><br>FILED: June 23, 2014 |

VERELLEN, A.C.J. — Although the Office of the Insurance Commissioner has broad regulatory authority, the Insurance Code, ch. 48.44 RCW, and the Consumer Protection Act (CPA), ch. 19.86 RCW, anticipate that policyholders may litigate CPA claims against insurers and their agents. Especially where the insurance commissioner declares he is unable to effectively regulate surplus levels maintained by nonprofit insurers, the filed rate, primary jurisdiction, and exhaustion of remedies

doctrines do not necessarily bar CPA claims alleging misrepresentations by insurers or their agents that resulted in excessive surplus levels.

The Washington Alliance for Healthcare Insurance Trust (WAHIT), a nonprofit trust, sells insurance issued by nonprofit entities Premera, Premera Blue Cross, and LifeWise Health Plan of Washington[1] (collectively Premera). Despite its nonprofit status, Premera holds more than $1 billion in "surplus." The plaintiffs purchased Premera policies through WAHIT and seek damages, including refunds of premiums they have paid, alleging that Premera and WAHIT violated the CPA and the Insurance Code by making false claims on a web site, in advertising mailings, and in other public statements. They contend that Premera accumulated its large surplus, in part, based upon these misrepresentations.

The trial court dismissed the lawsuit in its entirety based on the filed rate, primary jurisdiction, and exhaustion of remedies doctrines. We conclude that several claims were erroneously dismissed.

The filed rate doctrine bars suits against regulated entities challenging the reasonableness of their filed rates. Claims alleging only excessive, unnecessary, or unfair rates are precluded by the filed rate doctrine. But the doctrine does not necessarily bar CPA claims based on fraud or misrepresentation, even though the court may be required to consider the premiums paid in computing damages. Such calculations do not amount to "rate setting" by the court.

---

[1] WAHIT is a tax-exempt entity under the Internal Revenue Code, 26 U.S.C. § 501(c)(9). Premera is comprised of health care service contractors as defined in RCW 48.44.010(9). Premera was formed pursuant to the Washington Nonprofit Miscellaneous and Mutual Corporation Act, ch. 24.06 RCW. Premera Blue Cross and LifeWise Health Plan of Washington were formed pursuant to ch. 24.03 RCW, the Washington Nonprofit Corporation Act.

The primary jurisdiction doctrine is predicated on an attitude of judicial self-restraint and is applied when the court concludes that the dispute should be handled by an administrative agency created by the legislature to deal with such problems. The primary jurisdiction doctrine does not bar the CPA claims of misrepresentation and resulting excessive surplus because courts routinely address CPA misrepresentation claims and Insurance Commissioner Mike Kreidler has unequivocally stated that he lacks authority to effectively regulate such surpluses.

Litigants generally must exhaust available and adequate administrative remedies before seeking judicial intervention. Here, the exhaustion of remedies doctrine does not bar the policyholders' CPA claims because there is no showing that the insurance commissioner can provide an effective remedy.

Finally, the claims premised on selective underwriting were properly dismissed for failure to state a claim for relief to policyholders.

We affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Premera currently holds more than $1 billion in "surplus," approximately $250 million of which is profit from investments. "Surplus" refers to a company's total assets minus liabilities. As alleged by plaintiffs, "surplus" does not include the insurer's "claim reserves," defined by regulation as the total of unpaid reported claims plus reasonably expected claims not yet reported.[2]

---

[2] WAC 284-43-910(8). Neither the statutes nor the regulations define "surplus." A rate decision issued by the insurance commissioner defines it as "[a] company's assets minus its liabilities." Clerk's Papers at 131. To the extent Premera contends that "surplus" includes or overlaps with claim reserves, that question does not change our ultimate conclusion in this appeal and may be further explored on remand.

In this putative class action, the plaintiffs represent proposed classes of individuals and groups that purchased Premera policies through WAHIT: "Class A," the "large group" class, is comprised of groups with more than 50 persons; "Class B," the "small group" class, consists of groups of at least 1 but not more than 50 employees; and "Class C" is comprised of individual purchasers. The policyholders allege that Premera and WAHIT violated the CPA and the Insurance Code by (a) falsely claiming on the WAHIT web site that it is an "employer governed trust," (b) falsely advertising in WAHIT mailings that it "negotiate[s]" to obtain high quality benefits at the "lowest possible cost" or "most affordable cost," and (c) falsely claiming WAHIT to be a "member governed group," allowing "selective underwriting" that contributed to the surplus.[3] They also allege that deceptive acts in the form of false statements to the public resulted in excessive surplus.[4]

---

[3] Clerk's Papers at 7-9, 227.

[4] The 29-page complaint contains numerous allegations, but the plaintiffs' specific claims are set forth at paragraphs 21-22, consisting of (a) false assertions on the WAHIT web site that it is an "employer governed trust," (b) false advertising in WAHIT mailings that it "negotiate[s]" to obtain high quality benefits at the "lowest possible cost" or "most affordable cost," (c) false statements that WAHIT is a "member governed group," (d) claims that the insurers "falsely stated publicly that the reasons for the annual premium increases are because of increases in the cost of medical, hospital and health care" and "concealed from the plaintiffs and class members the fact that the percentage increases in those costs were not required to justify the increase in premiums," and (e) claims that the insurers "created [WAHIT]" in order to enable it to accumulate its surplus. Id. We do not read the complaint as asserting any claim regarding the surplus that is not, fundamentally, based on marketing misrepresentations or false statements to the public. Neither does the complaint state any claim that Premera's nonprofit status, in and of itself, or its statements to the public that it is a nonprofit provide a basis for any relief.

4

In Washington, statutes and administrative regulations provide for the insurance commissioner's review of all insurance premium rates.[5] The insurance commissioner may disapprove any individual or group contract if it is ambiguous or misleading or if the purchase of health care services is solicited by deceptive advertising.[6] The insurance commissioner may also disapprove any insurance contract if the benefits provided are "unreasonable in relation to the amount charged for the contract."[7]

Premera moved to dismiss the policyholders' claims pursuant to CR 12(b)(6) and CR 52, asserting that the filed rate doctrine, the insurance commissioner's primary jurisdiction, and the policyholders' failure to exhaust administrative remedies compelled dismissal. The trial court dismissed all claims brought by the "small group" Class B and the "individual" Class C plaintiffs pursuant to CR 12(b)(6) and dismissed all claims by the "large group" Class A plaintiffs on summary judgment.

The policyholders appeal.

## DISCUSSION

Premera contends that the insurance commissioner's rate approval process would be adversely impacted by allowing a court to consider challenges related to Premera's accumulated surplus. Premera also contends that the doctrine of primary jurisdiction applies because the insurance commissioner is an expert in regulating

---

[5] RCW 48.44.017(2), .020-.024, .040, .070, .110, .120, .180; WAC 284-43-901, -910 through -930, -945, -950.

[6] RCW 48.44.020(2), .110 ("No person shall knowingly make, publish, or disseminate any false, deceptive, or misleading representation or advertising in the conduct of the business of a health care service contractor, or relative to the business of a health care service contractor or to any person engaged therein.").

[7] RCW 48.44.020(3).

insurance companies' surpluses. Finally, Premera contends that the insurance commissioner's statutory authority to hold hearings and issue cease-and-desist orders were meaningful remedies available to the policyholders that they failed to exhaust.

Central to Premera's arguments is the premise that the insurance commissioner vigorously and effectively regulates the surplus maintained by the nonprofit insurers. However, Insurance Commissioner Mike Kreidler has publicly stated that surplus levels maintained by nonprofit insurers, including Premera, are excessive. Kreidler has also publicly asserted that he lacks the authority to effectively address or control the excessive surplus amassed by nonprofit insurers. He has unsuccessfully proposed legislation to more intensively address surpluses.[8]

This appeal is limited to whether the filed rate doctrine, primary jurisdiction, or failure to exhaust administrative remedies warrants dismissal of the policyholders' CPA claims of misrepresentation and the resulting excessive surplus. The parties have not briefed other questions as to the precise nature and nuances of those claims. This court reviews de novo a trial court's dismissal pursuant to CR 12(b)(6) and will affirm where no set of facts consistent with the complaint justify recovery.[9] This court reviews de novo an order granting summary judgment and will affirm

---

[8] At a hearing in support of Senate Bill 5247, 62d Leg., Reg. Sess. (Wash. 2012), designed to allow the insurance commissioner to consider surpluses in reviewing rates, Kreidler testified that "there should be a mechanism in place to be able to make sure that [nonprofits] are responsible to the community." Clerk's Papers at 214.

[9] Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 922 n.9, 296 P.3d 860 (2013); FutureSelect Portfolio Mgmt., Inc., v. Tremont Grp. Holdings, Inc., 175 Wn. App. 840, 865, 309 P.3d 555 (2013), review granted, 179 Wn.2d 1008 (2014).

where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[10]

*Filed Rate Doctrine*

The policyholders assert that the trial court erred by dismissing their claims pursuant to the filed rate doctrine, a court-created rule barring suits against regulated entities challenging the reasonableness of their filed rates.[11] The doctrine "provides, in essence, that any 'filed rate'—a rate filed with and approved by the governing regulatory agency—is per se reasonable and cannot be the subject of legal action against the private entity that filed it."[12] Several policies are advanced by the filed rate doctrine, including (1) reinforcing the agency's authority to determine the reasonableness of rates, (2) deferring to the agency's expertise in a particular industry, (3) recognizing and preserving the legislature's determinations as to the regulatory scheme by allowing for enforcement by statutorily designated state officers, and (4) preventing lawsuits from disrupting the statutory and regulatory scheme for uniformity of rates.[13]

Whether to extend the filed rate doctrine to a claim involving health insurance is a question of first impression. The only case in which our Supreme Court has addressed the filed rate doctrine, Tenore v. AT&T Wireless Servs., provides limited

---

[10] Lakey, 176 Wn.2d at 922.

[11] Tenore v. AT&T Wireless Services, 136 Wn.2d 322, 331, 962 P.2d 104 (1998).

[12] Id.

[13] See Wegoland Ltd v. NYNEX Corp., 27 F.3d 17, 18-21 (2d Cir. 1994); Edge v. State Farm Mut. Auto. Ins. Co., 366 S.C. 511, 623 S.E.2d 387, 391-92 (2005); Richardson v. Standard Guar. Ins. Co., 371 N.J. Super. 449, 853 A.2d 955, 963 (App. Div. 2004).

guidance on this issue.[14] In dicta, the Tenore court criticized judicial decisions from other jurisdictions that had applied the filed rate doctrine "rigidly, even to bar claims of a fraud or misrepresentation."[15] However, the court ultimately determined that the defendant, AT&T, was exempt from rate filing requirements and therefore the filed rate doctrine did not apply.[16]

By contrast, Hardy v. Claircom Communications Group, Inc., the only published opinion by this court considering the filed rate doctrine, appears on the surface to support a broader application of the doctrine.[17] There, a plaintiff sued telecommunications companies alleging negligent misrepresentation, fraud, breach of contract, and CPA violations based on the companies' practice of measuring air-to-ground telephone calls by rounding up the last fraction of a minute.[18] In determining whether to apply the doctrine, the Hardy court examined the nature of the claims and the effect of the remedies sought. Concluding that "any court-imposed award of damages would by definition result in [plaintiffs] paying something other than the filed rate," the Hardy court held that the claims were barred by the filed rate doctrine.[19] But

---

[14] 136 Wn.2d 322, 962 P.2d 104 (1998).

[15] Id. at 332 (citing Kan. City S. Ry. Co. v. Carl, 227 U.S. 639, 653, 33 S. Ct. 391, 395, 57 L. Ed. 683 (1913) ("Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper"); Marco Supply Co. v. AT&T Commc'ns, Inc., 875 F.2d 434 (4th Cir. 1989) (doctrine precludes claim of price misrepresentation); Taffet v. S. Co., 967 F.2d 1483 (11th Cir. 1992) (allegedly overcharged or defrauded customers suffered no cognizable injury because of filed rate); Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc., 919 S.W.2d 687 (Tex. App. 1996) (doctrine bars action for various allegedly anticompetitive practices committed by long distance provider)).

[16] Id. at 334-35.

[17] 86 Wn. App. 488, 937 P.2d 1128 (1997).

[18] Hardy, like Tenore, concerned federal regulation.

[19] Id. at 494-95.

Hardy has limited significance. As a federal court has noted, Hardy focused on the importance of efficient nationwide telephone and radio service, and the "application of the [filed rate] doctrine to a rate set by a federal agency in the telecommunications context does not mandate its application to a rate set by a state agency."[20]

We are not persuaded by the policyholders' argument that the filed rate doctrine does not apply to health insurance rates. The policyholders rely on Blaylock v. First American Title Insurance Co. in which the United States District Court for the Western District of Washington declined to extend the filed rate doctrine to a claim involving title insurance rates.[21] The Blaylock court emphasized that its determination applied only to title insurance rates, which are exempted from the more comprehensive regulations applicable to other categories of insurance.[22] Health insurance is more comprehensively regulated than title insurance. Given the extensive legislative and regulatory framework applicable to health insurance rates, the filed rate doctrine applies to health insurance.

We do agree with the policyholders that the filed rate doctrine has limitations consistent with the policy rationale for the doctrine, Washington's consumer protection statute, and insurance regulations. First, the CPA provides that consumers may bring claims against insurers. RCW 19.86.170 expressly allows CPA claims by private consumers in insurance-related disputes, including claims

---

[20] Blaylock v. First Amer. Title Ins. Co., 504 F. Supp. 2d 1091, 1101 n.8 (W.D. Wash. 2007).

[21] 504 F. Supp. 2d 1091, 1101-03 (W.D. Wash. 2007).

[22] Id. at 1102-03.

based on misrepresentations prohibited by the Insurance Code.[23] The rigid filed rate standard Premera proposes would significantly undercut these provisions.

Second, our Supreme Court has recognized that CPA misrepresentation claims against sellers in a regulated industry context are not necessarily direct attacks on the rates charged by the sellers. A nuanced approach, considering the specifics of the claim and the policy basis for the filed rate doctrine, is appropriate and consistent with our Supreme Court's analysis in Tenore. Tenore relied in part on Nader v. Allegheny Airlines, Inc.,[24] in which the United States Supreme Court allowed a misrepresentation claim against an airline that overbooked its flights without disclosing its overbooking practices.[25] The Nader Court determined there was no irreconcilable conflict between the regulation of airline carrier rates and the "persistence of common-law remedies" because the claim it analyzed did not "turn on a determination of the reasonableness of a challenged practice" but only on the issue of disclosure of that practice.[26] The Nader Court also determined that "[t]he standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts."[27] The Tenore court reasoned that since

---

[23] RCW 19.86.170 provides that "[n]othing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state . . . PROVIDED, HOWEVER, That actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020 and all sections of chapter 216, Laws of 1961 and chapter 19.86 RCW which provide for the implementation and enforcement of RCW 19.86.020."

[24] 426 U.S. 290, 96 S. Ct. 1978, 48 L. Ed. 2d 643 (1976).

[25] Tenore, 136 Wn.2d at 342-44.

[26] Nader, 426 U.S. at 299, 305.

[27] Id. at 305.

"[a]ppellants do not attack the reasonableness of AT&T's practice of rounding up call charges" but "challenge only nondisclosure of the practice," "Nader addresses the precise issue now before this Court."[28]

Other states recognize similar limits to the filed rate doctrine. For example, in Spielholz v. Superior Court, plaintiffs alleged that defendants falsely advertised a "'seamless calling area.'"[29] The California Court of Appeal held that such claims were not a direct attack on rates and that the lawsuit's potential effect on rates would be "merely incidental."[30] Similarly, in Kellerman v. MCI Telecommunications Corp., the Illinois Supreme Court held that class action consumer fraud claims based on false advertising practices were "not preempted" where the claims did not "challenge the reasonableness" of the charged rates "but only the fact that its advertising did not disclose that . . . additional charges would be made."[31] Likewise, in Qwest Corp. v. Kelly, the Arizona Supreme Court held that the filed rate doctrine did not bar claims that a telecommunications company concealed material facts in marketing and selling its services.[32] As in those cases, we conclude the policyholders' claims alleging nondisclosures and misrepresentations by Premera and WAHIT are not direct challenges to the rates charged.[33]

---

[28] Tenore, 136 Wn.2d at 344.

[29] 86 Cal. App. 4th 1366, 1369, 104 Cal. Rptr. 2d 197 (2001).

[30] Id. at 1375.

[31] 112 Ill. 2d 428, 436, 444, 493 N.E.2d 1045, 98 Ill. Dec. 24 (1986).

[32] 204 Ariz. 25, 36-37, 59 P.3d 789 (2002).

[33] See also Ciamaichelo v. Independence Blue Cross, 589 Pa. 415, 909 A.2d 1211, 1217-18 (2006) (Supreme Court of Pennsylvania determined that filed rate doctrine did not bar claims that an insurance seller accumulated excessive surplus funds dedicated to purposes inconsistent with nonprofit status).

Third, a court does not engage in "rate making" when considering the rates paid by policyholders as a measure of damages for a CPA misrepresentation claim. The Tenore court concluded that the plaintiffs' claims did not implicate rate setting and noted that awarding damages for misrepresentation was within the courts' competence:

> There is sufficient reliable authority for this Court to conclude that the state law claims brought by Appellants and the damages they seek do not implicate rate regulation . . . . The award of damages is not per se rate regulation, and as the United States Supreme Court has observed, does not require a court to "substitute its judgment for the agency's on the reasonableness of a rate." Any court is competent to determine an award of damages.[34]

We agree with the Tenore court's observations that awarding damages for CPA misrepresentation claims does not require a court to substitute its judgment on the reasonableness of a rate. An award measured by reference to premiums paid, as a remedy for misrepresentation, does not amount to a court second guessing the health insurance rate approved by the insurance commissioner and does nothing to weaken the rate approval process.[35] A CPA claim for damages caused by

---

[34] Tenore, 136 Wn.2d at 344-45 (quoting Nader, 426 U.S. at 299).

[35] Horwitz v. Banker's Life & Casualty Co., 319 Ill. App. 3d 390, 745 N.E.2d 591, 253 Ill. Dec. 468 (2001) and In re Empire Blue Cross & Blue Shield Customer Litigation, 164 Misc. 2d 350, 622 N.Y.S.2d 843 (Sup. Ct. 1994), cited by the insurers and WAHIT, are not persuasive in the context of the CPA claims at issue. Here, consistent with Tenore, the policyholders' request for an award of damages is not per se rate regulation. In Horwitz, the Illinois Appellate Court dismissed consumer fraud claims based on the filed rate doctrine where, in ascertaining damages, the court would be required to determine a reasonable rate absent the fraud. Horwitz, 745 N.E.2d at 605. In Empire Blue Cross, the New York Supreme Court dismissed consumer fraud claims based on the filed rate doctrine, concluding that "'[t]he fact that the remedy sought can be characterized as damages for fraud does not negate the fact that the court would be determining the reasonableness of rates.'" Empire Blue Cross, 622 N.Y.S.2d at 848 (emphasis omitted) (alteration in original) (quoting Wegoland, Ltd. v. NYNEX Corp., 806 F. Supp. 1112, 1119 (S.D.N.Y. 1992), aff'd, 27 F.3d 17).

misrepresentation in marketing insurance or in other public statements warrants consideration of the amount paid for the policy, and an insurer is not insulated from CPA misrepresentation claims merely because a recovery may ultimately impact its rates.

Fourth, Premera and WAHIT's other arguments are unpersuasive. Premera and WAHIT argue for a broad application of the filed rate doctrine that would bar claims based on false advertising, fraud, concealment, and violation of consumer protection acts. Premera relies on cases from other jurisdictions such as Clark v. Prudential Insurance Co. of America, in which the United States District Court for the District of New Jersey held that "[w]here fraud is present, the courts have left enforcement to the regulators, who are best situated to discover when regulated entities engage in fraud and to remedy fraud when it arises."[36] But Premera's argument would extend the filed rate doctrine to bar claims based on almost any business decision by the insurer because almost all such decisions ultimately implicate the rates charged to consumers. We conclude that such an interpretation of the filed rate doctrine is too broad.

Premera argues that a court could not find its surplus excessive without also finding that its insurance-commissioner-approved "contribution to surplus" was also excessive because Premera's rates include a "contribution to surplus" component which the insurance commissioner reviews for reasonableness. Premera cites to Lupton v. Blue Cross & Blue Shield of North Carolina to argue that the reasonableness of a rate cannot be litigated in the guise of an excessive surplus

---

[36] 736 F. Supp. 2d 902, 914 (D.N.J. 2010).

challenge.[37] There, plaintiffs alleged that an insurer charged excessive rates and exceeded the statutory limit on reserves. But Lupton is distinguishable because it did not involve consumer fraud or misrepresentation claims and, unlike Washington, North Carolina had a statutory limit to the amount of reserves an insurer could accumulate.[38] The Lupton court emphasized that "if Blue Cross accumulates a reserve in excess of the statutory limits, the Commissioner is authorized . . . to modify the rates, thereby affecting the amount of the reserve."[39] Premera does not assert that the Washington insurance commissioner has similar authority to modify Premera's rates to reduce existing surplus levels. Premera's reliance on Lupton is misplaced.

Finally, although claims alleging merely excessive, unnecessary, or unfair rates are precluded by the filed rate doctrine, CPA claims that a nonprofit company has accumulated a large surplus based on deceptive misrepresentations are not. Tenore provides guidance and is more germane than Hardy, which addressed rates set by a federal agency in the telecommunications context. Especially in light of Insurance Commissioner Kreidler's public statements that he lacks meaningful control of the surpluses accumulated by nonprofit health insurers, there is little basis for concern that allowing such CPA claims would interfere with the insurance commissioner's authority to regulate in this capacity.

---

[37] 139 N.C. App. 421, 533 S.E.2d 270 (2000) (dismissing claims of inflated rates due to excessive reserves based on the filed rate doctrine).

[38] Id. at 271-72.

[39] Id. at 273.

14

We conclude that the filed rate doctrine does not preclude the policyholders' CPA claims based on (a) assertions on the WAHIT web site that it is an "employer governed trust," (b) advertising in WAHIT mailings that it "negotiate[s]" to obtain high quality benefits at the "lowest possible cost" or "most affordable cost," (c) assertions that WAHIT is a "member governed group," (d) allegations that the insurers "falsely stated publicly that the reasons for the annual premium increases are because of increases in the cost of medical, hospital and health care" and "concealed from the plaintiffs and class members the fact that the percentage increases in those costs were not required to justify the increase in premiums," and (e) allegations that the insurers "created [WAHIT]" in order to enable it to accumulate its surplus.[40]

*Primary Jurisdiction*

The policyholders assert that the trial court erred by dismissing their claims pursuant to the primary jurisdiction doctrine. Because the insurance commissioner's public statements reveal that he is unable to effectively regulate the accumulation of surpluses, we agree.

The doctrine of primary jurisdiction is "'predicated on an attitude of judicial self-restraint' and is applied when the court feels that the dispute should be handled by an administrative agency created by the legislature to deal with such problems."[41] This court reviews a trial court's decision to apply the doctrine of primary jurisdiction for an abuse of discretion.[42]

---

[40] Clerk's Papers at 7-11, 227.

[41] Kerr v. Dep't of Game, 14 Wn. App. 427, 429, 542 P.2d 467 (1975) (quoting 2 FRANK E. COOPER, STATE ADMINISTRATIVE LAW 564 (1965)).

[42] Id.

The insurance commissioner has publicly stated that he lacks authority through existing regulations and laws, or otherwise, to effectively regulate nonprofit health insurance companies' accumulation of excessive surpluses. These statements are compelling. Washington cases hold that in the context of insurance, "although a commissioner cannot bind the courts, the court appropriately defers to a commissioner's interpretation of insurance statutes and rules."[43] Given his acknowledged lack of authority, policies supporting deference to the primary jurisdiction of the insurance commissioner have little traction.

Moreover, the CPA expressly allows claims against insurers for matters subject to the insurance commissioner's regulation, provided the claim is not based on activity allowed by insurance statutes and regulations.[44] It would be anomalous, in light of this statutory authorization for CPA claims, to conclude that the insurance commissioner's primary jurisdiction acts as an absolute bar to such claims.[45]

We conclude that the trial court erred in dismissing the claims based on the primary jurisdiction of the insurance commissioner.

*Exhaustion of Remedies*

The policyholders contend that the trial court erred by dismissing their claims based on their failure to exhaust administrative remedies. We agree.

Generally, litigants must exhaust administrative remedies before seeking

---

[43] Credit Gen. Ins. Co. v. Zewdu, 82 Wn. App. 620, 627, 919 P.2d 93 (1996).

[44] RCW 19.86.170.

[45] In general, multiple statutes can provide "synergies [of] multiple methods of regulation" consistent with each statute providing "its own mechanisms to enhance the protection of competitors and consumers." POM Wonderful LLC v. Coca-Cola Co., 2014 WL 2608859, at *9 (U.S. June 12, 2014).

judicial intervention when an agency has initial authority to evaluate and resolve a claim and the administrative remedy is adequate in relation to the relief sought.[46] But the requirement to exhaust administrative remedies does not apply if (a) the remedies would be patently inadequate, (b) the exhaustion of remedies would be futile, or (c) the grave, irreparable harm resulting from having to exhaust remedies clearly outweighs the policy requiring exhaustion of remedies.[47]

The policyholders assert that the courts should resolve their CPA claims that deceptive acts have resulted in an excessive surplus because (1) although the insurance commissioner considers ratepayers' contributions to surplus in reviewing and approving rates for Classes B and C, he does not evaluate whether there is an excessive surplus, (2) there is no regulation on point instructing the insurance commissioner how he is to address any excessive surplus, (3) there is no regulatory provision directing the insurance commissioner to consider a company's surplus in reviewing and approving the large group model for Class A, and (4) the insurance commissioner has expressly concluded that Premera has a grossly excessive surplus and that he has no authority to effectively address it.

As noted above, a litigant must exhaust administrative remedies only if an adequate administrative remedy is available. In addition to the insurance

---

[46] McConnell v. City of Seattle, 44 Wn. App. 316, 323, 722 P.2d 121 (1986).

[47] State v. Tacoma-Pierce County Multiple Listing Serv., 95 Wn.2d 280, 283-84, 622 P.2d 1190 (1980) (because violations of the CPA "are not cognizable" by the relevant agencies "but rather by the courts," "[t]here is no remedy in either [agency] to be exhausted; the doctrine does not apply"); Buechler v. Wenatchee Valley Coll., 174 Wn. App. 141, 154, 298 P.3d 110 ("A court may relieve a petitioner of the exhaustion requirement if exhaustion would be futile."), review denied, 178 Wn.2d 1005 (2013); Estate of Friedman v. Pierce County, 112 Wn.2d 68, 74, 77, 768 P.2d 462 (1989) (whether administrative remedies are futile is a question for the court and can be demonstrated by factual circumstances); see also RCW 34.05.534.

commissioner's own public statements of his limited authority, the statutes and regulations provide no mechanism for him to actively regulate a nonprofit insurer's excessive surplus. RCW 48.04.010(1) and (3) allow the insurance commissioner to grant a hearing to an aggrieved person, but he has no authority to compel the insurers to disgorge the surplus allegedly accumulated as a result of marketing misrepresentations.

Notably, as to putative Classes B and C, the insurance commissioner is only allowed to deny new rate increases in consideration of an insurer's contribution to surplus—arguably an ineffective power in view of the large surplus already accumulated. As to Classes B (small group) and C (individual), the criteria the insurance commissioner must use to assess the reasonableness of Premera's rates refer to narrow consideration of surplus and investment:

> (c) An actuarially sound provision for contribution to surplus, contingency charges, or risk charges, where the justification recognizes the carrier's investment earnings on assets other than those related to claim reserves or other similar liabilities; minus
>
> (d) An actuarially sound estimate of the forecasted investment earnings on assets related to claim reserves or other similar liabilities for the plans included in the filing for the rate renewal period.
>
> (3) *The contribution to surplus*, contingency charges, or risk charges . . . *will not be required to be less than zero.*[48]

The record contains several rate request decisions, one of which expressly refers to Premera's surplus level and investment income in refusing to approve a rate increase. Thus, while the insurance commissioner cannot force a health carrier to

---

[48] WAC 284-43-915(2), (3) (emphasis added).

use its surplus to lower its rates, he can and does consider the size of the surplus to reject the carriers' request to raise rates.

As to Class A (large group), the criteria the insurance commissioner must use to assess the reasonableness of Premera's rates do not include any reference to surplus or investment. Premera contends that the insurance commissioner considers contribution to surplus as one factor in his approval process of the large group model.[49] However, the model refers only to control of "minimum reserve contributions." Premera provides no compelling evidence to the contrary. Premera asserts that the sealed large group rate file includes examples of individual instances where the insurance commissioner limited rates to a "zero contribution" to surplus. But these examples reveal only that the remedies available through the insurance commissioner have an extremely limited impact in regulating an already-existing surplus. These examples of regulation do not make apparent how the insurance commissioner's limited authority impacts the accumulation of a $1 billion surplus by a nonprofit entity as alleged in the complaint.

There is no showing that an adequate administrative remedy exists. Here, the policyholders are suing for an award of monetary damages, attorney fees, and costs. No statute or regulation allows the insurance commissioner to grant the relief plaintiffs seek. Exhaustion of remedies is not required in these circumstances.

*Selective Underwriting*

The policyholders allege that WAHIT misrepresented itself as a member-governed plan in order to exempt itself from the requirement that it cover all eligible

---

[49] Premera relies on form H-4. See Clerk's Papers at 449.

applicants without regard to their health status or claim history. By so doing, the policyholders allege WAHIT could "'selectively underwrite and refuse to cover eligible applicants based upon their health status and/or claim history.'"[50] The policyholders argue that the filed rate doctrine should not bar this claim because the denial of coverage meant that eligible applicants were not issued the coverage and not charged any rates.

We conclude that this purported claim fails, regardless of whether selective underwriting amounts to a direct challenge of the rates charged. The putative classes are defined as those who have purchased policies. The policyholders do not establish any relationship to any harm purportedly suffered by those who may have been wrongfully denied coverage. Standing is a common law doctrine that prohibits a litigant from raising another's legal right.[51] The claims of a plaintiff who lacks standing cannot be resolved on the merits and must fail.[52] There is no basis to grant relief to the policyholders for any injury suffered by nonpolicyholders. The trial court properly dismissed the selective underwriting claim.

## CONCLUSION

This appeal is limited to the specific issues briefed—whether the filed rate, primary jurisdiction, and exhaustion of remedies doctrines support dismissal of the claims alleged. Those doctrines do not warrant dismissal of CPA claims based on

---

[50] Br. of Appellants at 30.

[51] Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 802, 83 P.3d 419 (2004); Berschauer Phillips Constr. Co. v. Mut. of Enumclaw Ins. Co., 175 Wn. App. 222, 226 n.5, 308 P.3d 681 (2013).

[52] Trinity Universal Ins. Co. v. Ohio Cas. Ins. Co., 176 Wn. App. 185, 198-99, 312 P.3d 976 (2013), review denied, 179 Wn.2d 1010 (2014).

alleged misrepresentations of WAHIT and false statements to the public by Premera. The selective underwriting claim was properly dismissed. We do not reach any other questions regarding the alleged claims.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

WE CONCUR: